### STROMER et ux. v. DUPONT et al.
### No. 1188.

Court of Appeal of Louisiana. First Circuit.
Oct. 5, 1933.

C. V. Pattison, of Lake Charles, for appellants.

McCoy, Moss & King, of Lake Charles, for appellees.

MOUTON, Judge.

On the 23d of July, 1932, Mrs. Stromer, one of the plaintiffs, was driving westward from Lake Charles in a Ford coupé on the Old Spanish Trail paved highway, and when she reached a point near the Gormerly's Filling Station, Paul Dupont, defendant, drove an Auburn sedan into the rear of her car, which resulted in damages to the Ford and in the death of Joel, the thirteen year old son of Mrs. Stromer, who was riding with his mother.

The Amsterdam Casualty Company carried an automobile liability insurance for Dupont and was made a defendant in the case.

Judgment was rendered for $6,265, in solido, against defendants, from which this appeal is taken.

When the Dupont sedan ran into the rear of the Ford coupé near the Gormerly Filling Station, it was going westward, the same direction Mrs. Stromer was traveling.

Mr. Dupont testifies that when he got on the bridge (which the evidence shows was the one that spans the Calcasieu river), due to repairs being made on the bridge, he stopped and saw the Ford coupé directly in front of him. He says the Ford went over the bridge, and that when he saw it again he was about four car lengths behind it; that he maintained that distance between the two cars and trailed the Ford from the bridge to where the accident happened, which the record shows was about three miles from the bridge. Asked why he had not passed ahead of the Ford, he answered, because the road was not very smooth, there were marshes on each side of the road, and that he did not know the country. In another part of his testimony, he says: "I can't say exactly why I didn't pass it, except that I didn't feel like passing it." Then says, "I was close to the town," meaning Lake Charles, and then admits he was about three miles from Lake Charles.

His testimony is not at all convincing. He says that the Ford came to a sudden stop ahead of his car, which was then in the rear about two car lengths; that he was then going about thirty-five miles an hour; that he tried to go to his right but could not because it had rained, and there was a ditch siding there and he could not go to the left because there was a car approaching from the opposite direction; that he slammed on his foot brakes with both feet on the clutch, but could not avert the accident.

Roland Cooley was also driving an auto from Lake Charles westward when the accident occurred. He says that his car was going at fifty miles an hour; that the Auburn sedan, Dupont's auto, passed ahead of his car and increased its speed on its way westward.

Charles Jones was driving the car in which Cooley was riding. Charlie Jones testifies he was going at fifty miles an hour when

·the Dupont car passed him and which seemed to be increasing its speed.

Cooley and Jones are residents of Texas, and were not interested in the outcome of this case, as far as the record discloses.

Dupont said that he did not recall passing any one between the Calcasieu bridge and where the collision occurred, and as he had no recollection as to whether or not he passed ahead of any other car, there is nothing to contradict the testimony of Cooley and Jones that his auto had gone ahead of them while they were traveling at the rate of fifty miles an hour.

It is shown by the testimony of Le Blanc, who saw the collision, that the spare tire of the Ford coupé was driven into the back of that car by the Dupont sedan, and that the Stromer car was knocked to a distance between seventy-five and one hundred feet from the point of impact.

Dupin, witness for defendants, was questioned as follows on this subject: "After the Stromer car was hit how far was it knocked?" He answered: "About seventy-five feet. After I measured·it was 110 feet."

The knocking of the coupé to such a distance taken in connection with the facts, hereinabove referred to, shows that the Dupont car was going at an excessive, if not at a reckless, rate of speed when it ran into the other car.

Mr. Robira, district attorney, testified that Mr. Dupont, after the accident, stated to him that when he hit the car he had reduced his speed to thirty or thirty-five miles an hour, but that he had been going fast.

Mr. Dupont, testifying in rebuttal, did not deny having made that statement to Mr. Robira, but says he does not remember having made it.

We have no doubt, from our analysis of the evidence, that, as was stated by Messrs. Jones and Cooley, Dupont passed ahead of them at a speed exceeding fifty miles an hour and perhaps had reduced it to some extent when he crashed into the other car.

It is true, as was testified by Mr. Dupont, that when or at about the time he ran into the coupé another car was coming eastward and therefore from the opposite direction.

Mrs. Ellender, the evidence shows, was driving that car, and that Miss Denison and Mrs. Johnson were riding with her.

She testifies that she was driving on her right side of the pavement and that so was Mrs. Stromer, whose car was on her right side, north of the pavement. Asked if the Stromer car was moving or stationary when she first saw it, she answered: "I thought it was stopped." As she passed the car she saw the collision. She testified that she did not remember if Mrs. Stromer was holding out her hand when she saw her.

Mrs. Johnson testifies that when she first saw Mrs. Stromer's car Mrs. Stromer had her left hand out, and that if her car was moving "it was very, very little"; and that the car coming behind was going so fast that just before the cars collided, she said there was "going to be a wreck." Mrs. Johnson also said that Mrs. Stromer's car was, at that time, on the north side of the pavement.

The testimony ·of Miss Denison, the other occupant of the Ellender car, is that Mrs. Stromer was on her right side of the pavement when she first saw her car, which had or was almost stopped, and that Mrs. Stromer.was holding her left hand out of her car.

Mrs. Stromer, plaintiff, testifies· that she had gradually slowed down to a stop when she was struck by the Dupont car and had given a signal by extending her left hand out of her car. She says also that she looked through the mirror in her car at the time but did not see any car coming in the rear.

It is established by the testimony of these witnesses, and others,· that 'the Stromer car had come to a stop or was slowly stopping and was on its right side of the pavement when struck by the Dupont car.

It is also shown by the testimony of Miss Denison, Mrs. Johnson, and Mrs. Stromer that she put her left hand out of her car as a signal before stopping on the side of the pavement, on the south of which was the driveway to the filling station where Mrs. Stromer said she intended to get some water for her car.

Section 19 (a, b) of Act No. 296 of 1928, pp. 628, 637, provides, in referring to signals on starting, stopping or turning vehicles, as follows:

" (a) The driver of any vehicle upon a highway before starting, stopping or turning from a direct line shall first see that such movement can be made in safety and if any pedestrian may be affected by such movement shall give a clearly audible signal by sounding the horn, and whenever the operation of any other vehicle may be affected by such movement shall give a signal as required in this section plainly visible to the driver of such other vehicle of the intention to make such movement.

" (b) The signal herein required shall be given either by means of the hand and arm in the manner herein specified. * * * Whenever the signal is given by means of the hand and arm, the driver shall indicate his intention to start, stop, or turn by extending the hand and arm horizontally from and beyond the left side of the vehicle."

It clearly appears that Mrs. Stromer came gradually to a stop and extended her hand beyond the left side of her car before she was struck by the Dupont car.

█ In the case of Henican v. Woodman, 1 La. App. 281, the court said:

"It is the duty of the chauffeur driving behind an auto to so regulate his distance and his speed as not to collide with a car in front of him in case the latter comes to a stop." See, to the same effect, Roberts v. Eason, 6 La. App. 703.

Dupont testifies that he was about at a distance of two car lengths when Mrs. Stromer suddenly stopped.

Dupin, witness for defendants, who saw the collision from a restaurant near the Gormerly's Filling Station, says that when the Stromer car was slowing down to stop, the Dupont car was about a car length distant from the Stromer car.

Mr. Dupont was certainly not at a safe distance from the other car and no doubt was then traveling at an excessive rate of speed. He did not see when Mrs. Stromer began to slow down, nor did he see her left hand extended out of her car as a warning. He was so close to the Stromer car at that crucial moment, when the Stromer car was stopped, that he did not have the time to determine whether he would make a turn to his right or to his left to avoid the impending impact. The applying of his brakes was then too late, which appears from the fact that the Stromer car was knocked to a distance of one hundred feet or more from the point of collision.

█ Counsel for defendants refers to several decisions where it is held, as follows:

"An automobile driver, who by the negligence of another and not by his own negligence, is suddenly confronted by an emergency and compelled to act instantly to avoid a collision, is not guilty of negligence if he makes such a choice as a person of ordinary prudence placed in such a position might make, even though he did not make the wisest choice.

This court has so held, and so have the other courts of this state. This rule applies when the emergency which confronts the driver is created by the negligence of another. This is not the situation here, as Mrs. Stromer came to a stop after gradually slowing down with her left hand out of her car as a signal of warning. The emergency existing at the time was brought about by Mr. Dupont, who kept his car in dangerous proximity to the other car, while traveling, under the circumstances, at an inexcusable rate of speed. The rule of law that, where the emergency is created by another, the driver of a car cannot be held guilty of negligence

should he not make the wisest choice in trying to avoid the accident, does not apply in the instant case.

Here, as we have above remarked, due to the position in which Mr. Dupont had placed himself, we do not think, under the emergency he had himself created, that he would have had the time to make a choice to extricate himself from his perilous position.

Other cases are referred to by counsel for defendants which hold that a motorist is not responsible for an accident when it is caused by the sudden appearance or stopping of a car in front of his moving auto.

█ In this case there was no sudden appearance or stopping of the Stromer car ahead of Mr. Dupont's car, as we have before explained. The stopping was slow and gradual while the driver's hand was out as a warning to Mr. Dupont. The rule of law invoked by defendants has no application to the facts of this case, which show that the accident was due entirely to the reckless driving of Mr. Dupont and to which Mrs. Stromer did not contribute.

The defendants were properly held liable in damages.

██ The amount allowed is $6,265, which counsel for defendants contends should be reduced.

He refers to the case of Wyble v. Putfork (La. App.) 141 So. 776, where the court held that the average amount allowed for a child twelve years of age, where there are two parents, is about $5,000. After recognizing that such was the average amount recoverable, the court said, in consideration of the increased purchasing power of the dollar of which it had the right to take judicial cognizance, it would not disturb the allowance of $4,000, decreed below. That decision was rendered in May, 1932, when the purchasing power of the dollar had fallen about as low as it could reach.

Times have changed with the New Deal, which has brought about a rise in the price of commodities and a consequent loss in the purchasing power of the dollar, of which we can likewise take judicial cognizance.

In view of the present value of the dollar, we do not think that the sum of $6,000 allowed for the death of plaintiffs' son herein is excessive, which with the expenses incurred amount to the total of $6,265 decreed by the district judge.

Judgment affirmed.