[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 526 
Tillman Scott, a colored man, age twenty-two years, was electrocuted about the hour of 9:30 A.M. on April 26, 1942, when his body contacted a down high voltage wire of Claiborne Electric Cooperative Inc. (hereinafter referred to as defendant), two miles north of the town of Homer in Claiborne Parish. His widow, Eva Scott, individually and as natural tutrix of Tillman Scott, Jr., posthumous son and sole heir of the deceased, instituted this suit against said corporation and its insurer, Employers' Liability Assurance Corporation, Ltd., of the State of Massachusetts, to recover damages suffered and experienced by them as the result and consequences of the tragic death of the husband and father, in the sum of $25,000.
The accident occurred on a dam which impounded water on a farm of Robert G. Harmon. The dimensions of the dam are variously estimated by several witnesses, but in briefs there is very little difference between counsel as regards them. Each side says the dam was 150 feet long, 14 feet high with a crown of 4 feet. Plaintiffs' counsel say the base was 12 feet, whereas defendants' say it was 16 feet. The difference is of no great importance. Normally, the impounded water covered approximately three-fourths of an acre, referred to as a pond. The dam extended easterly and westerly. It connected two high hills which extended northerly therefrom and was paralleled by a public highway. The watershed was approximately thirty acres. The pond's normal average depth at the dam was between 7 feet and 10 feet.
The dam was made from natural earth and was constructed by Harmon in 1922 to serve his property. However, it was not enclosed and the pond was freely used by all persons who wished to do so. Swimming and fishing therein were commonly engaged in by residents of the community.
A well beaten narrow path ran the entire length of the dam upon which pedestrians and stock traveled at will, particularly people living west of the pond who desired to reach the highway by the shortest route. A growth of young trees, several feet high, weeds, briars, etc., covered the crown of the dam and its sides. These appear to have been denser and higher on the western half. Foliage was well developed at date of the accident.
In June, 1939, defendant constructed a high power electric line in Claiborne Parish and adjacent territory, the route of which passed over Harmon's property from north to south. An easement or right-of-way for said line was procured from him, but the instrument evidencing same has not been registered in Claiborne Parish and, therefore, we are without knowledge concerning its terms and conditions.
Defendant erected one of its 35 foot poles in the center of the dam about midway its length. The pole was 8 inches in diameter and was sunk 7 feet or about half way from the top of the dam to its base. Two wires were then attached to it. When the dam was erected a drain pipe 8 inches in diameter was put through it. The record does not show exactly how far this pipe was below the surface of the dam. It is shown that the pole was sunk against or very near to this pipe, the opening of which was stopped up in 1941 and remained in that condition to the time of the accident. There was also a spillway at the dam's eastern end. The pipe and the spillway were adequate to prevent overflow of the dam until the pipe was stopped up.
Some time during the year 1941 another electric wire was added to the power line and at that time an 8 foot crossbar was attached to the pole. All three wires were then affixed to the crossbar.
During the night of April 25th-26th, 1942, an unusually heavy rain fell throughout the territory wherein the dam is located. *Page 527 
It is not proven, as alleged and argued, that the rain was unprecedented. The accumulated water ran over the dam causing a crevasse therein at the situs of the pole 6 or 7 feet deep and about 15 feet wide. The pole washed out and fell westerly across the crevasse with the crossarm suspended erect or nearly so above the western slope of the dam. The foot of the pole extended southerly from the base. The three wires remained in place on the cross-arm, one of which was 4 feet above the ground, while the others were 6 or 7 feet above it. All of them crossed the path very close to the western edge of the crevasse.
The deceased and his stepfather, John Pitts, lived on a farm a short distance from the dam. In early morning, following cessation of the rain, Pitts and the deceased walked to the home of Sam Ferguson, a tenant of Harmon, who also looked after the Harmon property. The three, at Ferguson's suggestion, walked westerly to look over a tract of his cotton and when this had been done they started back to their homes, which could be reached more quickly by using the dam. They knew the dam had broken but did not think the crevasse as large as it was. Several feet of water remained in the pond. When they reached the dam Pitts was ahead, Scott next and Ferguson last. They entered upon the path but, evidently on account of the trees, weeds and foliage, neither saw the wires across the path until Pitts almost walked into the lowest one. He suddenly stooped under it and at the same time holloed to the others not to touch it, and at this juncture the earth beneath his feet gave way and he was precipitated to the bottom of the crevasse. Scott was not over three feet behind him. Evidently Pitts' warning was not given in time for Scott to benefit from it. He walked abreast into the lowest wire and was killed. Ferguson was uninjured.
Actionable acts of negligence, constituting the proximate cause of the accident, are charged against the defendant. These are:
1. By placing the pole, which supported uninsulated highly charged electric wires, in the dam, which, from its very nature, location, surroundings, etc., was unsafe for same; that sinking the pole in the dam as was done, was calculated to and did, in fact, weaken its strength as a barrier to the impounded waters, thereby enhancing the danger of the dam breaking where it did and endangering the lives of persons rightfully using same, as did happen.
2. Allowing the drain pipe to become and remain clogged, and for lack of outlet for excessive rainfall the dam was frequently overflowed at or near the pole which caused a shallow drain across the dam; that repeated overflows finally brought about caving and sloughing of the earth on the pole's south side; that this potential dangerous physical condition was easily observable by anyone who inspected the locus; that this condition remained unrepaired from many months prior and to the time of the accident; that the failure to make proper inspection of the dam and to make necessary repairs thereto constituted negligence of the grossest sort.
3. Failure of defendant, after the rainstorm, to inspect its line for down live wires, especially on or about the dam to 9:30 A.M. April 26th, the time deceased met his death.
Defendants specially plead that deceased when killed was a trespasser. They deny that there was any negligence whatever on defendant's part, in placing, erecting and maintaining the pole involved in this case, and aver that the break of the dam was an act of God. This defense, however, appears to have been abandoned. In the alternative, the negligence of the deceased in walking into and against the wire, then, as is alleged, in plain view, after being warned by Pitts not to touch the wire, is pleaded in bar of recovery by his widow and heir.
Trial of the case resulted in a judgment of $4,000 in favor of each plaintiff. Defendants prosecute this appeal which has been answered by plaintiffs wherein they pray that the judgment be increased to the amount for which sued.
No one knows exactly how the crevasse occurred. It could have occurred in different ways, viz:
1. By water seeping along the drain pipe, gradually widening the avenue of escape and undermining that portion of the dam immediately above it;
2. By caving and sloughing from the south side of the pole; and
3. By a blowout from the north side of the dam due to increased pressure from the impounded and overflowing water. *Page 528 
We are of the opinion that the placing of the pole in the levee in the manner done amounted to negligence per se. To us this conclusion appears obviously sound. No attempt was made through testimony of engineers to justify the action of defendant in selecting this narrow levee as a basis for one of its large poles. Defendant's lineman who repaired the wires and sank a new pole on solid ground south of the dam, testified that he would not have put the pole in the dam had he originally been in charge of constructing the line; but that he would have placed it where he did the new one after the accident.
To assert that the pole was safely and prudently located ignores common human experience in combating flood waters of the many rivers of this nation, on whose banks protecting levees are built. When these rivers are high above flood stage levees thereon are constantly guarded in the hope of preventing crevasses. The maximum of alertness has often proven futile.
The dam in question was constructed of loose earth. Its base was narrow; its crown much more so. The pressure of above normal volume of water was at all times a potential threat to it. This danger was augmented from time to time as the water's level rose from heavy rainfall. The danger of the dam failing was further increased by allowing the overflow pipe to become and to remain clogged. It is shown to our satisfaction that flood waters did not run over the dam so long as this pipe functioned.
There are two seriously contested issues of fact in this case, each of which has a material bearing upon the ultimate decision. One relates to the physical conditions allowed to arise and to continue about the pole, especially with regard to caving and sloughing on its south side. The other relates to the height and density of the bushes and vegetation on the dam, especially on its west half. This question has important bearing upon the plea of contributory negligence.
When defendant elected to erect the pole where it did, a positive duty thereby devolved upon it to exercise the utmost care in its maintenance, and a most rigid system of inspection of the locus to the end that nothing be omitted or left undone to entirely eliminate, so far as humanly possible, in view of its original negligence, the chances of injuring persons who had a right to be upon the dam. This, it did not do.
The testimony convinces us that the overflow water passing across the dam at the pole did create a drain which many months prior to the accident caused the south side of the dam to cave and slough. Several witnesses who observed the dam and walked over it regularly are positive this condition did exist and had existed for the time stated. Some say that the caving finally came to the pole, was too wide to step over, and that it attained a depth of three or four feet prior to the crevasse. If this be true, and we accept the testimony to that effect, then it is highly probable the dam broke because this condition was allowed to remain unrepaired until the rain storm the night prior to the accident.
The degree of care required of those who engage in the production and distribution of that violent and subtle agency called electricity has been variously described and defined by the courts and text writers of the country. Different language has been employed in the effort to do this but the substance of the decided majority of the decisions are in agreement. That which is said in 18 American Jurisprudence, pp. 443, 446, § 48, reflects the majority ruling. It reads:
"* * * While the measure of duty resting upon electric companies in order to exonerate them from liability for negligence is expressed by the courts in forms varying from reasonable or ordinary care and diligence to a close approximation to the view that they are insurers, yet the generally accepted rule in such cases, as in determining liability for negligent injuries generally, is that such companies are bound to use reasonable care in the construction and maintenance of their lines and apparatus — that is, such care as a reasonable man would use under the circumstances — and will be responsible for any conduct falling short of this standard. The degree of care which will satisfy this requirement varies, of course, with the danger which will be incurred by negligence and must be commensurate with the danger involved. According to numerous decisions, where the wires maintained by a company are designed to carry a strong and powerful current of electricity, so that persons coming in contact with them are certain to be seriously injured, if not *Page 529 
killed, the law imposes upon the company the duty of exercising the utmost care and prudence consistent with the practical operation of its plant to prevent such injury; * * * The law is complied with when the company provides such a protection as will safely guard against any contingency that is reasonably to be anticipated. The company is not legally bound to safeguard against occurrences that cannot be reasonably expected or contemplated."
A study of the numerous Louisiana decisions involving injury or death from contact with highly charged electric wires leaves no doubt that the jurisprudence of this state with regard to the character of care that devolves upon those engaged in the production and distribution of electricity is in accord with the rule above quoted. The rule is approved and followed in Potts v. Shreveport Belt Railway Company, 110 La. 1, 7, 34 So. 103, 105, 98 Am.St.Rep. 452, in the following language: "A company maintaining electrical wires over which a high voltage of electricity is conveyed, rendering them highly dangerous to others, is under the duty of using the necessary care and prudence at places where others may have the right to go either for work or pleasure, to prevent injury."
It is also followed in Hebert v. Lake Charles Ice, Light 
Water Works Company, Ltd., 111 La. 522-531, 35 So. 731, 735, 64 L.R.A. 101, 100 Am.St.Rep. 505, as appears from the following terse expression: "* * * In behalf of human life and the safety of mankind generally, it behooves those who would profit by the use of this subtle and violent element of nature to exercise the greatest degree of care and constant vigilance in inspecting and maintaining the wires in perfect condition."
To same effect are: Babin v. Sewerage Water Board of New Orleans et al., 2 La.App. 517; Ledet et al. v. Lockport Power 
Light Company, Inc., 15 La.App. 426; 132 So. 272; Bynum v. City of Monroe, La.App., 171 So. 116; Webb v. Louisiana Power Light Company, La.App., 199 So. 451; Mays et al. v. Southwestern Gas 
Electric Company, 174 La. 368; 140 So. 626; Hughes et al. v. Southwestern Gas Electric Company, 175 La. 336; 143 So. 281.
It is argued that as the dam had withstood all tests for some seventeen years prior to the erection of the pole thereon, this fact warranted the conclusion that it was a safe place for it; that in erecting the pole thereon defendant acted as would have a reasonable man under the circumstances; and that the breaking of the dam could not have been reasonably expected or anticipated. The first phase of this position is satisfactorily answered by the well established fact that so long as the originally provided drainage functioned, the heaviest rainfalls were insufficient to overflow or break the dam.
We think that which did happen, in view of all the facts and circumstances, could have been, in legal contemplation, reasonably expected and anticipated; and this is especially true when considered in the light of developments subsequent to the erection of the pole. We hereinabove commented upon the lack of infallibility of earthen levees generally. When defendant chose to erect the pole on the dam there automatically arose the correlative obligation on its part to do all that was necessary and possible to protect the dam against dangers to its continued existence which theretofore had not existed. A reasonably prudent man desiring to promote and protect his own interest, would not have allowed the drain pipe to remain stopped up after discovering the effect thereof upon water levels. He would doubtless have immediately concluded that to allow the pipe to remain clogged would eventually cause the dam to give way from heavy rainfall. Actionable negligence in a case of this character does not necessarily depend upon what actually happened, but upon what might have reasonably been expected to happen. Humphrey v. Twin State Gas Electric Co., 100 Vt. 414, 139 A. 440, 56 A.L.R. 1011.
In cases of this sort, as is true in other tort actions, to hold the electric company responsible in damages, it is not enough to prove its negligence as a contributing factor to the accident and resulting injury or death, but, in addition, it must appear that such negligence was the proximate cause thereof. Proximate cause of an injury has been defined as "that which in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury, without which such injury would not have occurred." 18 *Page 530 
Am.Juris. 447, § 52. But this rule is subject to exceptions, as is true of practically all other legal rules. This is definitely reflected by the following excerpt from § 53 of the cited authority, to-wit: "The negligence of an electric company cannot, according to the generally accepted test, be said to be the proximate cause of an injury within the law of negligence unless, under all the circumstances, the injury might have been reasonably foreseen by a person of ordinary intelligence and prudence; it is not enough to prove that the injury is a natural consequence of its negligence. It must also have been the probable consequence." See also Stumpf v. Baronne Building, Inc., et al., 16 La.App. 702, 135 So. 100.
This exception to the general rule is given emphasis in the Hebert case, supra, the facts of which, together with the conclusions of the court as to defendant's negligence being the proximate cause of the accident involved therein, are clearly and cogently set forth in paragraphs two and three of the syllabus. They read:
"It is the absolute duty of an electric light company conveying electricity by overhead wires strung through the streets of a city to keep its wires constantly insulated so as to be prepared to guard against the effect of objects coming in contact with them regardless of the facts and causes which may bring about the contact.
"The facts that a telephone company may have strung its wires above those of the electric light company already in position, and should have taken no steps to guard against the coming in contact of the wires of the two companies at the crossing points, and that in stringing its wires it did so so negligently and loosely that one of its wires fell, in a storm, upon an un-insulated wire below, causing it to burn and fall on the street, is no excuse to the electric company in not having performed its own duty of additional and special precautions in the premises. A fault on the part of the telephone company did not relieve it from the consequence of its own fault. The falling of the telephone wire on the wire below would have been attended with no disaster but for the un-insulated condition of the latter, and that condition is to be attributed as the proximate cause of the death of the husband and father of the plaintiffs."
This court in Layne v. Louisiana Power and Light Company, et al., La.App., 161 So. 29, applied the principle embodied in the mentioned exception. As appears from the syllabus, it was held therein:
"Power company held negligent in stringing uninsulated high tension wire only sixteen inches from metal roof of gin house and two feet below ridge of roof, as respects liability for injuries to carpenter coming in contact with such wire.
"Power company's negligence in stringing uninsulated high tension wire sixteen inches from metal roof of gin house and two feet below ridge of roof held proximate cause of injury to carpenter putting iron roof on gin house when piece of corrugated iron came in contact with wire.
* * * * * *
"Evidence held to establish that sole proximate cause of injury to carpenter from coming in contact with uninsulated high tension wire near metal roof on which he was working was negligence of power company in placing wire too close to roof."
In that case the plaintiff, as was true of the deceased in the present case, had the right to be where he was when injured. The negligence of the electric company there, as here, had its incipiency long prior to the accident but continued without interruption to the happening thereof.
Our view of the case renders it unnecessary to pass upon the contention that the failure of defendant to inspect its line about the dam after the rain storm and prior to time of the accident, amounts to actionable negligence. The falling of the pole did not interrupt the normal flow of the current over the wire and there being no other accident that did so, no special reason was present to prompt an inspection of the lines to ascertain if any damage thereto had occurred.
We believe there is no merit in the defense that deceased was a trespasser when killed. The facts negative this charge. He was in reality a licensee as to Harmon, the owner of the dam. As to defendant, his status was simply that of a passer-by, killed where he had a right to be. Concerning this question we quote with approval from 29 Corpus Juris, 587, § 43, verbo "Electricity", the following: "The doctrine of nonliability to trespassers or licensees has been applied to *Page 531 
relieve defendant of liability where the trespass or license was with respect to the property of a third person and not to that of defendant. According to the apparent weight of authority, however, that doctrine has no application to such class of cases, because conceding that plaintiff was a trespasser as to the owner, he was not a trespasser as to defendant, and defendant may be held liable for negligence in failing to exercise proper care and precaution to prevent injury, not only to persons who had a right to be at the place where the injury occurred, as to whom liability for negligence is unquestioned, but also to persons who defendant should reasonably have anticipated might be present and exposed to danger at that place, as in the case of places to which children or other persons are accustomed to resort, although without technical right to be at such places."
The rule, as regards trespassers and licensees expressed in the above quotation, finds positive support in 56 A.L.R. 1030, although the earlier decisions were almost equally divided on the subject. 14 A.L.R. 1038. Anent this rule, it is said in 14 A.L.R. 1038, § VII: "Its (the electric company's) negligent act has worked the mischief, and the mere relation of the injured person to the property owner is a matter which it should not be permitted to inquire into."
The plea of contributory negligence is earnestly urged upon our attention but we think it also is not well founded.
Undoubtedly the bushes, briars and other vegetation west of the crevasse were of sufficient height and density to obscure the presence of the three parallel wires across the path. The undergrowth in places overlapped the path. Pitts, who was ahead of the deceased, testified that because of the bushes, etc., he did not see the wire until almost against it. Ferguson did not see it until Scott was electrocuted. It stands to reason that Scott did not see the wire in time to avoid contact with it. Ordinarily in such circumstances a person would take hold of a wire with his hand but it is certain Scott did not do this.
The fact that Pitts was in front of Scott served also to prevent him from seeing the wire before Pitts holloed. At that time evidently he was moving forward and too close to the wire for mental and physical processes to react in time to avert what did happen. If Scott had seen the wire in time to avoid walking into it, it necessarily follows that he purposely killed himself. No such absurd contention is made. No one will be presumed to commit suicide. Had Scott innocently walked into the wire during night time, the situation for all legal intentions and purposes would not be unlike we now find it to be. He would have met death solely from defendant's negligence.
The immediate facts attending the death of the fireman involved in the case of City of Shreveport v. Southwestern Gas Electric Company, 145 La. 680, 685, 82 So. 785, 787, are quite similar to those of the case at bar. The fireman was killed when he contacted a live arc light wire above the awning of the building wherein a fire was raging. Two firemen successfully passed between this wire and two others below it. The third one was not that fortunate. In discussing the issue, the court said: "This fireman was in the ordinary discharge of his duties, and was guilty of no negligence. The fact that his two companions ahead of him saw and avoided this wire does not argue against him. His opportunity for seeing it, or for appreciating at the moment its dangerous character, may not have been as good as theirs. And if even they had failed to observe it, there would have been nothing to wonder at under the circumstances: The imperfect light; the necessary precipitancy of their movements; the flames inside; the excitement; the insecure footing on the steep awning. * * *"
We are convinced that the deceased met tragic death without any negligence whatever on his part.
Appellants assail the damage award as being excessive. Appellees, on the other hand, urge that the amount be increased to that for which sued. The reduced purchasing power of the dollar due to increased cost of living expenses is pointed to as justifying the desire for the increase.
The deceased was instantly killed. The voltage of the wire was 7200. Therefore, no cause of action for pain and suffering was transmitted. His only child was then unborn. The record proves him to have been sound physically and in good health. His life expectancy was more than thirty-five years. The record *Page 532 
reflects that he was frugal and industrious, although possessed of meager worldly goods. He mainly farmed for a livelihood but between farming seasons sought and performed labor at public works and on industrial projects. His annual income was about $500.
The deceased and plaintiff were married on December 6, 1941, less than five months before his untimely demise. They lived happily for this brief wedlock, and doubtless his tragic death overwhelmed her with grief and sorrow, to say nothing of the shock because of its suddenness. She was at the time in a state of pregnancy of several months' duration.
Counsel of each side cited several cases to support their respective contention as regards the quantum. Uniformity in cases of this sort is highly desirable but relatively impossible. Earnest effort is made by all courts to keep such awards as nearly as possible, within the bounds of uniformity. However, after all is said and done, each case necessarily must be largely determined from its own peculiar facts.
The award certainly is not, in view of present day economic conditions, excessive; neither is it manifestly inadequate. This being true, we do not feel authorized in disturbing the finding of the trial judge on the question.
It is now well recognized that the decreased purchasing power of the dollar, due to rise in living expenses, is a proper element for consideration in determining the amount of award in a tort action. Courts take judicial notice of that fact. Bell v. First National Life Insurance Company, La.App., 141 So. 484; Stromer et ux. v. Dupont et al., La.App., 150 So. 32; Van Baast v. Thibaut Feed Mills et al., 151 So. 226; Rogers v. Hiram J. Allen Lumber Company, Ltd., 129 La. 900, 903, 57 So. 166, 39 L.R.A., N.S., 202; 15 Am. Jurisprudence, 621.
In the Rogers case, supra, the court expressly stated that the award of damages would not be reduced because the purchasing power of the dollar had fallen.
We think the award fixed by the trial judge in this case fairly well compensates for the purchasing power of the dollar being below normal.
For the reasons herein assigned, the judgment appealed from is affirmed at the cost of the appellants.