This is a suit for damages by Gus B. Levy for the death of his wife and his 21 year old daughter, Dorothea Helene, who were killed when the automobile in which they were riding and which was driven by Mrs. Levy was struck by a locomotive operated by employees of defendant, New Orleans Northeastern Railroad Company. The accident occurred at about 7:15 p.m., well after dark, on October 25, 1943.
Mr. Levy also makes claim for the value of his automobile which he fixes at $2200. It was virtually destroyed. He claims a total of $32,200 including the claims which, as survivor, he makes for the mental anguish, pain and suffering each of the two ladies suffered.
In the district court there was judgment in his favor for $16,300; $7,500 for the loss of his wife, a like amount for the loss of his daughter, and $1,300 for the loss of the automobile. The defendant has appealed and plaintiff, by answer to the appeal, seeks an increase in the award.
The accident took place on Gentilly Boulevard where that thoroughfare crosses the tracks of the New Orleans Terminal Company. At that point Gentilly Boulevard and Bruxelles Street converge and cross the tracks almost together. Gentilly Boulevard is very broad and is paved. It does not cross the tracks at a right angle and as the automobile approached the crossing its occupants, to some slight degree, were facing into the direction from which the locomotive approached. The tracks are on an embankment elevated a few feet. The automobile was being driven by Mrs. Levy out Gentilly Boulevard from the main portion of New Orleans towards the lower portion of the city and the locomotive, with only a caboose attached, was coming towards the city. Thus the locomotive approached from the right-hand side of the automobile. With plaintiff's wife and daughter in the car was Miss Rose Stein Phillips who, though injured, was not killed.
There were two railroad tracks, one used by trains coming into New Orleans and the other by out-bound traffic. The train, coming towards New Orleans, was on the inbound track. The Levy car had crossed the other track when it was struck by the locomotive. On the outbound track and to the right of the crossing was a very long freight train of another railroad company which had been standing there for at least 20 or 30 minutes prior to the accident and its rear end, which was its end nearest the crossing, was at a distance estimated by various witnesses as being from a few feet to about 400 feet. Except for this other train, which plaintiff claims to some extent interfered with the view and which defendant maintains had no connection whatever with the accident, there was nothing to obstruct the view between the car and the train after the car had passed a small building to the right, about 149 feet from the nearest rail of the track on which the train was approaching.
The acts of negligence with which plaintiff charges defendant's employees are the following:
(1) That the engine and caboose were operated at an illegal rate of speed, which plaintiff fixed at 30 miles per hour;
(2) That the defendant company and its employees were negligent in permitting the said engine and caboose to emerge from behind the other parked train without stopping;
(3) That there was negligence in that the engine and caboose were not brought to a stop before going over the crossing;
(4) That the company was negligent in that it did not have a switchman at the crossing at least two minutes before the approach of the train as plaintiff claims is required by Ordinance No. 555 C.S., dated January 25, 1884; and
(5) That the railroad company and its employees were negligent in that they drove the said locomotive over the said crossing without slowing up or stopping and without maintaining a proper lookout in spite of the fact that at this crossing "thousands of vehicles pass every day" and that over it too "the New Orleans Public Service, Inc. operates buses, which are street cars carrying passengers and are operated as street cars * * *."
Defendant denies that its train was being operated at an excessive speed and avers that it was proceeding at a reasonable and safe speed; that its headlight was burning brightly; that its bell was ringing; that its steam whistle was blowing and that at the crossing there were electric automatic *Page 562 
red flash lights on both sides and that these were operating perfectly as the automobile approached. Defendant especially denies that there is any ordinance or statute which requires that at that crossing a flagman be stationed at any time. And defendant further avers that the sole cause of the accident was the negligence of the driver of the automobile in failing to take advantage of the various warnings and in failing to stop in spite of the fact that she had ample opportunity to do so.
In the alternative, defendant avers that if there was any negligence on its part or on the part of any of its employees, the contributory negligence of Mrs. Levy, as above set forth, was the proximate cause of the accident and bars recovery, and defendant also charges that each of the other occupants of the car was also negligent in failing to notice the various warning signals and in failing to warn Mrs. Levy of the danger.
While the record is voluminous, a large part of the evidence touches upon facts which are either not in dispute or which are so overwhelmingly proven as to necessitate no discussion by us. For instance, there is no doubt whatever that the bright electric headlight was burning, that the bell and steam whistle were being sounded almost constantly during the several hundred feet which the locomotive traversed before reaching the crossing, and that the automatic flashing red electric warning lights were operating and that they complied with the requirements of an applicable city ordinance.
Counsel for plaintiff argues that in addition to the requirements of that city ordinance concerning those warning lights, there is another ordinance which requires that for at least two minutes before the arrival of any train there shall be a flagman stationed at each crossing in the City of New Orleans at which this railroad or certain other named railroads cross streets "on which street cars are running."
Defendant concedes that there was no flagman at this crossing but maintains that that ordinance has no reference whatever to that crossing since there are no street car tracks there and since no street cars are operated over it. We shall consider and dispose of this contention at this time.
It is conceded that there were no car tracks crossing the railroad tracks at that point. The General Traffic Ordinance of the City of New Orleans, No. 13702, C.C.S., describes a street car as follows: "Street Car. Every device traveling exclusively upon rails when upon or crossing a street, other than cars or trains propelled or moved by steam."
[1, 2] On behalf of plaintiff it is argued that at crossings over which motor busses operate there is as much necessity for a flagman as there is at those over which street cars operate on rails; that in effect busses are street cars and that since modern urban transportation development is fast substituting the motor bus for the rail street car, we should hold that a reasonable interpretation of the ordinance requires that it be held applicable to such a crossing.
In a Texas case, Patillo v. State, 120 Tex.Crim. R.,47 S.W.2d 847, 848, the court considered whether a statute which referring to "a train or street car or interurban car", Vernon's Ann.P.C. art. 1659, subd. 4, should be held to apply to motor busses not operated on rails. It was held that the statute did not apply. The court made a statement which we think pertinent here: "When courts, in construing statutes, depart from the language employed by the legislator, they incur the risk of mistaking the legislative will, or declaring it to exist where, in truth, it never had an expression. The legitimate function of courts is to interpret the legislative will, not to supplement it, or to supply it."
It would be a dangerous practice indeed for courts to attempt to decide that an ordinance or a statute which by its express wording is limited to a certain thing or subject should be extended to others which, though possibly similar, are not included within the express terms of the statute or ordinance. If there is a necessity that such enactments be amended so as to bring them abreast of modern transportation development the amendments should come from the municipal authorities or the state legislators. They cannot come from the courts.
[3] We next concern ourselves with an effort to determine the speed at which the train approached and we notice at once an admitted fact that by the rules of the railroad company over whose tracks defendant was operating its train, the speed should not have exceeded six miles per hour. It is admitted too that by its own rules, defendant company made this and other rules of the owning company applicable *Page 563 
to its trains while on the tracks of the other company. The district judge found as a fact that this train "was greatly exceeding" this six mile limit. The evidence on this point is irreconcilable. The crew of the train all stated that when the crossing was reached its speed was six miles an hour and that it had been reduced from a higher speed which was variously estimated at from 10 to 15 miles per hour. Members of the crew of the other train who saw this train pass said that its speed was much greater. For instance, Bauer who was the switchman and engine foreman of the other train, and who was some distance from the crossing, says that when the locomotive in question passed him "he was really going". He estimated its speed at 30 miles per hour or more. We think it certain that the speed did exceed by a fair margin the six mile limit fixed in the rules and yet we doubt that it was anywhere near as great as plaintiff claims or that it was as high as 20 or 30 miles per hour.
The flashing red signals at the crossing were operated by an electric current which passes through the rails and contact for the operation of these lights is made by the wheels of each train as it passes over the rails. The bonded circuit extends 70 feet beyond the crossing on the city side of Gentilly Boulevard so that had the train completely cleared that point before coming to a stop after the accident the lights would have stopped flashing. It is shown conclusively that those lights continued to flash after the train came to a stop so that it is certain that the rear end of the caboose was then not more than 70 feet from the crossing and the locomotive and caboose together were about 100 feet in length.
Unfortunately, the record does not show what distances are required to make an emergency stop of such a train at various speeds but we are quite certain that had it been running at a speed of 20 miles or more per hour it could not have been stopped in so short a distance, and we are equally certain that had its speed been as low as six miles per hour it could have been stopped sooner. We conclude that its speed was violative of the company's own rules and that to this extent there was negligence in defendant's employees.
The engineer of the train could not see this automobile as it approached the crossing because it came from his left and it is shown that because of the design of a steam locomotive, the boiler extending far in front of the engineer's seat at the right, his view to the left of the track is cut off by the boiler for a distance of considerably more than a hundred feet. But both the fireman and the brakeman were sitting on the left side of the locomotive and both had a clear and unobstructed view of the crossing and could see as far to the left as the small building which we have said was more than 140 feet from the track. The fireman said that as the train approached the crossing he saw five or six automobiles stopped on Gentilly Boulevard on the left waiting for the train to pass, and that just before the locomotive reached the crossing he saw plaintiff's automobile pass these stationary cars; that it seemed to come almost to a stop and then suddenly increase its speed and run into or just in front of the locomotive. He shouted to the engineer to stop. The brakeman likewise saw several stationary cars at the crossing waiting for the train to pass, and he says that just as the locomotive was going over the crossing the automobile emerged from among those stationary cars. He, too, shouted to the engineer to stop.
The conductor was riding in the caboose looking out of a window of the cupola. He says that when he was about 400 feet from the crossing he noticed a number of automobiles in line standing on Gentilly Boulevard to the left of the track; that he didn't notice this automobile until it passed the front stationary car of that line but that just as the locomotive was negotiating the crossing, this car, passing the stationary cars, crashed into the left front of the locomotive.
These witnesses agree in almost all details except that the conductor fixes the speed of the automobile at 30 miles per hour while the fireman and the brakeman both think that it was going much slower.
Whether the stationary train of the other railroad played any part in the accident in that it obstructed the view of the occupants of the Levy car or of the operators of the train is a disputed question. Miss Phillips at one point in her testimony states that the other train "blocked" her view of the approaching locomotive but her testimony as a whole shows that she really knew nothing and saw nothing until a moment prior to the impact.
Bauer, the engine foreman and switchman of the other train, a witness who was *Page 564 
obviously very favorable to plaintiff, says that the rear end of his train was 300 feet from the crossing.
Singer, who was in charge of the other train, says that the rear end was so far away from the crossing that it did not obstruct the view. All of the employees of defendant say that the other train was so far from the crossing that it did not interfere at all with the view either way. Defendant's engineer puts it at six car lengths (240 feet) from the crossing. Defendant's brakeman says that it was about ten car lengths (400 feet) from the crossing. Still another employee places it as far as 600 feet away.
The engine of that other train had stopped a short distance before reaching the next crossing to the north and there was sufficient space between the two crossings to accommodate this train and to leave. several hundred feet of unoccupied track. It is reasonable to believe that the engineer of that other train proceeded almost up to the other crossing before bringing it to a stop. We conclude that the other train was from 200 to 400 feet from the crossing and actually played no part in the accident. The district judge found that it was about 200 or 300 feet away.
It is very difficult to reach a conclusion as to the speed at which the automobile approached the crossing. Some of the witnesses say that it was going very slowly and others say that it seemed to be running at about 30 miles an hour. We think it certain that there were several other cars which had been ahead of it and which stopped to let the train go by, and that while these automobiles were standing in line waiting for the train to pass, this car passed to their left and continued until it struck or was struck by the locomotive. Some of defendant's witnesses who saw it say that as it passed the other cars its speed was reduced when it suddenly started forward again. The conductor says that "it shot out" from behind the other cars and that its speed was high.
That there was and almost always is very heavy vehicular traffic at this crossing is very evident. The district judge so found and said: "Owing to the congestion, for cars to stop to look and to listen would be neither feasible nor practicable but would cause a traffic jam to the detriment of incoming and outgoing traffic."
[4, 5] Counsel for plaintiff severely criticize defendant because of the fact that at the time of the accident there was no flagman on the train. This was due to the fact that this train had been running ahead of a passenger train and practically on the time of the passenger train which was late, and that the flagman had been left at the "yards" on the edge of the city to flag the passenger train to make certain that there would be no danger to it nor to the locomotive and caboose which were ahead of it. It is shown conclusively that this flagman, had he been on this particular train, would not have performed any duties in connection with the negotiation of this crossing. We conclude that his absence played no part whatever in the ensuing accident. Our conclusion as a whole is that the railroad employees were negligent in that they were operating the train at a speed which exceeded the maximum limit fixed by the rules of the company, and we need cite no authorities to show that it is negligence for the employees of a railroad company to violate company rules when such rules have been adopted in the interests of safety. Had the speed of the train not exceeded the limit fixed by the rules, who can say that the accident might not have been averted? Surely the train at six miles an hour could have been stopped within a much shorter distance than was required, and who can say that, even if Mrs. Levy was also at fault in driving her car upon the track without noticing the on-coming locomotive, the accident might not have been averted had the speed been within the limit fixed by the rules? Can the railroad be heard to say that the accident would nevertheless have occurred in spite of the speed of the locomotive?
[6] On the other hand, however, the record leaves us thoroughly convinced of the contributory negligence of Mrs. Levy. There were, as has been shown, several other automobiles ahead of her car and all of them had stopped to permit the train to pass. This fact, in itself, is suggestive of contributory negligence on her part. These other cars, standing still, not only gave proof of the fact that the flashing lights and the approaching train were plainly visible to a prudent driver, but they, themselves, furnished an additional warning, if any additional warning was necessary. But even had these other cars not been there, the blowing of the whistle, the ringing of the bell, the brilliant headlight, the flashing of the automatic signal lights and the noise made by the train itself; all of *Page 565 
these produced what should have been ample warning of the great danger of proceeding. To proceed in the face of these warnings was negligence and without that negligence the accident could not have occurred regardless of the speed of the train.
If Mrs. Levy was confused by the warning signals and by her unfamiliarity with that crossing, then she should have been all the more careful. If she was of the opinion that the flashing lights indicated the presence of the stationary train, surely she should have noticed that the other automobiles were stopped and should have been more careful herself in making certain that it would be safe to proceed. But the fact that she was on the way to the family dressmaker renders it fairly safe to presume that she was not quite so unfamiliar with that neighborhood as counsel would have us believe. But familiarity with a crossing is not necessary in order for a driver to understand the meaning of such warnings. Whistles, bells, and above all, flashing red lights have the same meaning everywhere, among unfamiliar scenes as well as near home.
The suggestion that the vehicular traffic was so heavy that it would have been dangerous for her to stop, or that it would have been imprudent for her to stop, to look or listen because this would have interfered with the movement of that traffic and that, therefore, the obligation to look and to listen at such railroad crossing does not exist, cannot be accepted by us with favor. All of the other drivers saw or heard and all stopped. The duty to stop, or at any rate, to look or listen, is not only imposed by the dictates of common prudence and safety but is expressly imposed by the Louisiana Highway Regulatory Act (Act No. 286 of 1938). See Par. (a), Rule 17, of Sec. 3, of Title II. It is also required by City Ordinance No. 14,104, C.C. S., which amends City Ordinance No. 13,702, the General Traffic Ordinance of the City of New Orleans. While in many cases it has been held that under certain conditions it may not be necessary that the motorist bring his vehicle to a stop, in none that we know of has it been held that he need not look and need not listen.
[7] It is argued that even though Mrs. Levy may have been negligent, the railroad employees had the last clear chance to avoid the accident and should have done so; that after Mrs. Levy's car reached a point so close to the track that it was obvious that she was not going to stop, the railroad employees could even then have averted the accident. The greater the speed of the train, the lesser the possibility of stopping it when the danger became apparent. And the record leaves us convinced that when it became evident that one of the automobiles in the group to the left of the train was not going to stop, the train was already so near that there was nothing its crew could have done.
[8] If, as at least one of the witnesses states, Mrs. Levy's car, at a speed of 30 miles an hour, "shot out" from the other side of the line of stopped cars, surely the crew had no opportunity to realize the danger. On the other hand, if, as other witnesses say, Mrs. Levy's car slowly approached the track just as the other cars had done, and that they felt sure that its driver intended to stop, surely they were not negligent in believing that it would be brought to a stop before reaching the track. That is what happens at almost every crossing, urban or country, every time a train approaches. The crew sees many automobiles driving towards the crossing and they assume, as they are justified in doing, that each car is going to stop. See Cook v. Louisiana N.W. R. Co.,130 La. 917, 58 So. 767; Guillot v. Louisiana Rwy. Navigation Co., 3 La. App. 541; Perry v. Louisiana Ark. Rwy. Co., La. App., 142 So. 736. Those in charge of a train are not required to bring it to a stop unless there is reason to believe that the driver of the approaching car is oblivious of the on-coming train. The last clear chance here rested not in the crew of the train but in Mrs. Levy for it is made very clear that after the locomotive reached a point so near to the crossing that it could not be stopped there yet remained time for her to stop her automobile had she been aware of the danger as she should have been. Therefore, because of the contributory negligence of Mrs. Levy there can be no recovery by plaintiff for her death.
[9, 10] But her negligence is not to be imputed to the other persons in the car with her. That is well settled. Therefore unless there was independent negligence in Miss Levy; unless she herself did something which was negligent or failed to do something which she should have done, and, unless it appears that the accident would have been averted had she, herself, not been at fault, then, in spite of the negligence of the driver of the car, there may *Page 566 
be recovery for her death. And we do not think that there is anything in the record to show that Miss Levy was guilty of independent negligence. The time which elapsed after that moment at which she should have realized that her mother did not intend to stop was obviously so short that no warning on her part could possibly have been effective. It is true that there are many cases in which recovery was denied to a guest passenger because of his own negligence, independent of the negligence of the driver. See Toups v. Morgan's Louisiana 
Tex. R. R. S. S. Co., 4 La. App. 136; Aaron v. Martin et al.,188 La. 371, 177 So. 242; Lorance v. Smith, 173 La. 883,138 So. 871. But in all of those cases the court was convinced that there was time for a warning by the guest to have been effective in preventing the accident. And in many of them it was said that often warnings by passengers or statements by "back seat" drivers should not be indulged in indiscriminately as they are often disconcerting and irritating to the driver. See Alost v. J. Moock Wood Drayage Co., 10 La. App. 57, 120 So. 791; Williams v. Lenfant, 15 La. App. 515, 131 So. 857.
When we come to consider the amount to be allowed to Mr. Levy for the death of his daughter we notice that both ladies died almost instantly. Miss Levy was 21 years of age, had not contributed to the support of the family, and, it is obvious that the family was in comfortable circumstances and that the father was not in need of financial assistance from the daughter. The only item of damage then to be considered is the mental anguish of the bereaved parent over the death of his daughter who, it seems, was so close and dear to him that she was referred to as his "pal". The mental suffering of a parent in such a case as this can be no more measured than it can be compensated for in money. The task of the courts in attempting to assess such mental anguish; to set its value in dollars is more than difficult, it is impossible of exact accomplishment. It is necessary, of course, that there be some uniformity in jurisprudence on the subject. A realization of this and a determination to do the best we can to accomplish this purpose has lead to a study of all the cases cited by counsel for both parties.
[11, 12] In the first place, we say again what we have aleady said several times, and which has been said by many other courts, that at the present time the purchasing power of the dollar is low and that what might have been an adequate award several years ago would no doubt be inadequate now. This principle has been recognized during every era in which the value of the dollar as a medium of exchange has dropped below normal.
In January, 1912, which many of us recall as a year in which the dollar was greatly depressed, the Supreme Court said in Rogers v. Hiram J. Allen Lumber Co., 129 La. 900, 57 So. 166, 167, 39 L.R.A., N.S., 202, that it felt justified in allowing a greater amount "in view of the decrease within the past few years in the purchasing power of money."
In November, 1920, the Supreme Court in Schneller v. Louisiana State Rice Milling Co., 148 La. 88, 86 So. 663, 664, said: "The diminished purchasing power of money must also be taken into consideration."
In March, 1943, in Scott v. Claiborne Electric Cooperative, Inc., 13 So.2d 524, 532, the Court of Appeal for the Second Circuit said: "It is now well recognized that the decreased purchasing power of the dollar, due to the rise in living expenses, is a proper element for consideration in determining the amount of award in a tort action."
Though often courts, on the ground that the group of facts of which we may take judicial cognizance is small, refuse to notice obvious facts of which there is no proof in the record, of this fact it is well settled that the courts may take judicial notice. See Scott v. Claiborne Electric Cooperative, supra; Bell v. First Nat'l Life Ins. Co., La. App., 141 So. 484. And surely we need no proof that the condition which existed in March, 1943 still exists and has, in fact, become even more noticeable.
[13] Counsel for defendant point out that in Boykin v. Plauche et al., La. App., 168 So. 741, 746; Id., La. App., 169 So. 131, is found the largest award ever made by an appellate court in Louisiana for the death of an adult child. There the court awarded $8,780 for the loss of a son, $780 of this being for actual expenses. The mother, who was plaintiff, was legally separated from her husband and had only this son to support her. The court said: "He was more than twenty-three years old and was really the only one she could look to for support * * *." *Page 567 
Counsel for plaintiff cites cases in which two surviving parents were awarded $10,000 for the loss of a child and argues that since there is only one parent, the loss of the child is felt all the more and that at least that amount should be allowed here. But there are other cases in which it has been held that if $10,000 is the proper award where there are two parents, $5,000 is correct where there is only one. See Vincent v. Morgan's Louisiana T. R. R. S. S. Co., 140 La. 1027, 74 So. 541. A study of all the cases convinces us that the allowance of $7,500 for the death of the daughter is in accord with established precedents and takes into consideration the depressed value of the dollar.
We now consider the claim of plaintiff for the value of the destroyed automobile. Should he be allowed to recover for it or should his wife's contributory negligence stand in his way? It seems to have been given to him and his wife by his brother, Dr. Louis Levy, for although at one time he said that it had been given to him, at another point he referred to a statement of Dr. Levy to the effect that Mrs. Levy had obtained from that car more pleasure than from any other thing "I ever gave her." We conclude that this car formed part of the community which existed between them for it is provided in Article 2402 of our Civil Code that among those things which go into the community which exists between the husband and the wife are "donations made jointly to them both."
[14] The general rule is that the husband is not liable for damage caused by the negligence of the wife in driving an automobile which belongs to the community unless it appears that the car was being used at the time for a community purpose. See Adams v. Golson, 187 La. 363, 174 So. 876.
[15] If the negligence of the wife cannot render the husband liable unless the negligent act was committed while the wife was engaged in attending to the affairs of the community, surely the converse of the rule is also true and the contributory negligence of the wife should not prevent the husband from recovering from a joint tortfeasor for damage caused to the community automobile. If the community was in no way concerned with the purpose for which the trip was being made and if it had not been expressly authorized, the negligence of Mrs. Levy could not be used as a bar to recovery because it would then appear that Mr. Levy had merely loaned the car to his daughter who was of age, in order that she might visit her dressmaker, and where the owner of an automobile lends it to some one else and it is damaged through the combined negligence of that other person and some third person, the negligence of the borrower cannot prevent recovery by the owner for the damage to his car. Meyer v. Rein, La. App.,18 So.2d 69; Sewell v. Newton, La. App., 152 So. 389; U-Drive-It-Car Co. v. Texas Pipe Line Co., 14 La. App. 524, 129 So. 565.
[16] What then was the purpose for which the automobile was being used when the accident took place? The three ladies were on their way to visit a dressmaker and, of course, if it was Mrs. Levy who was interested in seeing the dressmaker, then it could be said that the trip was being made in the interest of the community. Paderas v. Stauffer, 10 La. App. 50, 119 So. 757, 120 So. 886, 887. Mr. Levy made no effort to clear up this question, and we think that in order for him to recover for the value of his car it was necessary that it be shown that it was not being used on a community errand. The burden was on him to show this fact for when it is shown that a wife is driving the community car and an accident occurs, and the husband desires to avoid being liable as head of the community or wishes to make claim for the damage to the automobile, the burden is on him to produce the necessary proof to sustain his contention that the car was not being used in the interest of the community. In Paderas v. Stauffer, supra, where the contention of the defendant depended upon a showing that the purpose of the trip was not in the interest of the community, we said that the reason for such a trip "is a matter so completely and exclusively within the knowledge of (the members of the community) that the burden of producing evidence concerning the reason for * * * the trip is placed upon them."
[17, 18] It is true that Miss Phillips made one statement touching upon the purpose of the trip. She referred to the daughter and said: "I think we were going out for her" but in another part of her testimony she shows very plainly that this was a mere guess and she adds that the trip may have been for either or both Mrs. Levy and Miss Levy. If the trip was for *Page 568 
Miss Levy then it was not in the interest of the community for she was 21 years of age and, therefore, as a strict matter of law, the community which existed between Mr. and Mrs. Levy was no longer obligated to provide her clothing. But we think that the evidence falls far short of showing with the necessary certainty that the car was not being used in the interests of the community, and we conclude that the contributory negligence of Mrs. Levy should bar recovery by Mr. Levy. But even if the "guess" of Miss Phillips that the principal purpose of the trip was to see the dressmaker for Miss Levy, still we think that Mr. Levy should not be permitted to recover for another reason. He knew that Mrs. Levy was in the habit of driving the car for her own recreation or pleasure and expressly authorized her to use it for that purpose, he knew she was using it at the time of the accident and it is evident that one of the objects of the trip was recreation for Mrs. Levy. We are well aware of all that was said by our Supreme Court in Adams v. Golson, supra, and we have no intention of engaging in the futile pastime of disagreeing, but we think that even that case does not necessarily negative the possibility that the negligence of a wife in driving the community car for her own pleasure or recreation may be chargeable to the husband as head of the community if he has expressly authorized the use of the car for that purpose. In some jurisdictions there is recognized what is known as the "family purpose doctrine." Under it the head of the family may be responsible for the damage caused by the family car while it is being used for a family purpose and conversely the head of a family cannot recover for damage sustained by the family car engaged on a family mission if there was contributory negligence in the driver of the car. Though that doctrine is not recognized here, there are cases in which it has been held that even though the wife may be driving the car solely for her own pleasure, the husband, as head of the community, may be chargeable with her negligence if he has authorized the use of the car for that purpose. The doctrine expressed in Adams v. Golson, supra, does not render this result impossible for there the court pointed out that not only had no express authority been given but that the facts did not warrant the conclusion that there was implied authority. In Tarleton-Gaspard v. Malochee, 16 La. App. 527, 133 So. 409, 413, in an opinion written by Judge Higgins, now Justice of the Supreme Court, we said that the husband "had authorized his wife to use it as a family car"; that it was "customary" for her to use it in that way and that the wife "under the circumstances, was his agent just the same as if she had been a family chauffeur." And we see no reason why a husband as head of the community should not, under such facts, be chargeable with the negligence of the wife. The community is a partnership and to its success both partners contribute. The mental and physical health of the partners is essential to its success and anything which enhances the health of the partners is of value to the partnership. Within the limits of the living standards set by the family income, it is the duty of the community to furnish pleasure and recreation to the wife as well as to the husband, and while, because of the decision in Adams v. Golson it cannot be said that the husband is responsible for the negligence of the wife in unauthorizedly driving the family car for her own pleasure, we see no reason why, if the husband either expressly or by implication authorizes the wife to use the car for her pleasure, the community and the husband as its head, should not be liable for her negligence. For both of these reasons then, first, because he has not shown what was the purpose of the trip, and, second, because he expressly authorized the trip, we think that Mr. Levy, by the contributory negligence of his wife, is barred from recovery for the loss of the automobile.
For these reasons it is ordered, adjudged and decreed that the judgment appealed from be and it is amended by the reduction thereof to $7,500, with legal interest from judicial demand, plaintiff to pay costs of appeal, defendant to pay all other costs.
Amended and affirmed.