### Sadie Patillo v. The State.

No. 14584. Delivered March 23, 1932.

The opinion states the case.

*W. R. Blain,* of Beaumont, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

HAWKINS, JUDGE.—Subdivision 1, article 1659, P. C., reads as follows: "Every railway company, street car company and interurban company, lessee, manager, or receiver thereof doing business in this State as a common carrier of passengers for hire shall provide separate coaches or compartments for the accommodation of white and negro passengers."

Subdivision 4, of the same article, is as follows: "If any passenger upon a train or street car or interurban car provided with separate coaches or compartments as above provided shall ride in any coach or compartment not designated for his race after having been forbidden to do so by the conductor in charge of the train, he shall be fined not less than five nor more than twenty-five dollars."

Appellant was prosecuted for a violation of subdivision 4 of said article and her punishment assessed at a fine of $10.

The affidavit and information upon which the prosecution rests alleged that the Eastern Texas Electric Railway Company was a street car company doing business in this state as a common carrier of passengers for hire, and as such operated a bus in the city of Beaumont; that said bus was provided with separate compartments for the accommodation of white and negro passengers, designated by proper markers; that appellant, a person of African descent, did unlawfully ride as a passenger on said bus in a compartment not designated for the negro race, after having been forbidden to do so by the conductor in charge of said bus.

It is not necessary to set out the evidence. The agreed statement of facts is quite short, and supports the averments in the state's pleadings.

Appellant presented a motion to quash the complaint and information upon the ground that appellant was charged therein with no violation of any law of the state of Texas.

Article 3, P. C., provides, in part: "No person shall be punished for an act or omission, unless the same is made a penal offense."

Article 7, P. C., provides that: "* * * every other law upon the subject of crime which may be enacted shall be construed according to the plain import of the language in which it is written * * * and no person. shall be punished for an offense which is not made penal by the plain import of the words of the law."

Article 8, P. C., in so far as it is applicable, is as follows: "All words used in this Code, except where a word, term, or phrase is specially defined, are to be taken and construed in the sense in which they are understood in common language."

In common language a train, street car or interurban car is understood to be one which serves the public in conveying passengers or freight,

or both, and which runs upon fixed tracks. "Bus" is a contraction of the word "omnibus," and it is well understood to be a vehicle which serves the passenger public, but which does not operate upon fixed tracks. It certainly is not a "train," nor an "interurban car," and no one would understand in common language that when a street car was mentioned it had reference to a "bus." In Ex parte Vance, 42 Texas Crim. Rep., 619, 62 S. W., 568, a very clear distinction was recognized between an omnibus and a street car, and an ordinance of the city of Fort Worth was held to discriminate in favor of the street car.

It is clear that in the enactment of the statute under consideration the Legislature intended to segregate the white and negro races when passengers upon trains, street cars, or interurban cars. It may be equally as desirable to segregate them when passengers upon buses, in view of the recent development of the use of such vehicles not only upon the streets of our cities, but also upon the highways of the state. It may be unfortunate that the Legislature did not provide for such a contingency by inserting in the law after trains, street cars and interurbans, the word "buses," or the words "other public conveyances," or some similar expression. No such general terms were used. The Legislature might not wish to incorporate them in the statute. It has not done so, although the use of buses on our highways and streets has been increasing rapidly in the past few years.

The question is, can this court read "buses" into the statute without doing violence to statutory construction, or without usurping legislative functions?

In Murray et al. v. State, 21 Texas App., 620, 2 S. W., 759, discussing the proper rules for the construction of statutes, Judge White quoted with approval from Bishop on Statutory Crimes (2d Ed.), sec. 220, as follows: " 'No parallel case which comes within the same mischief shall be construed to be within the purview of it (the statute) unless it can be brought within the meaning of the words.' In slightly different language, though a case of this sort is fully within the mischief to be remedied, and even of the same class, and within the same reason as other cases enumerated in the statute, construction will not be permitted to bring it within the statute unless it is also within the stautory words."

Further quoting from the case mentioned, we find the following: "That distinguished jurist and law writer, Mr. Dillon, in the case of The United States v. Clayton [Fed. Cas. No. 14814], diccussing this subject, uses the following apt, pertinent and forcible language. He says, 'This is, as above observed, a question of legislative intention. Now, in what manner do the courts ascertain the legislative will? We answer that it is ascertained primarily and chiefly by the language the Legislature has used to express its meaning. We must suppose in the enactment of statutes, particularly statutes so important as the one under consideration,

that Congress weighed well the words it employed. In the office of inter-pretation, courts, particularly in statutes that create crimes, must closely regard, and even cling to the language which the Legislature has selected to express its purpose. And when the words are not technical, or words of art, the presumption is a reasonable and strong one that they were used by the Legislature in their ordinary, popular, or general signification. Statutes enjoin obedience to their requirements, and, unless the contrary appears, it is to be taken that the Legislature did not use the words in which its commands are expressed in any unusual sense. For these reasons, whose cogency is obvious, the law is settled that, in construing statutes, the language used is never to be lost sight of, and the presumption is that the language is used in no extraordinary sense, but in its common, every-day meaning. *When courts, in construing statutes, depart from the lan-guage employed by the legislator, they incur the risk of mistaking the legislative will, or declaring it to exist where, in truth, it has never had an expression. The legitimate function of courts is to INTERPRET the legislative will, not to supplement it, or to supply it.* (Italics ours). The judiciary must limit themselves to expounding the law; they can not make it. It belongs only to the legislative department to create crimes and ordain punishments. Accordingly courts, in the construction of statuable offenses, have always regarded it as their plain duty *cautiously to keep clearly within the expressed will of the Legislature, lest otherwise they shall hold an act or an omission to be a crime, and punish it, when in fact the Legislature had never so intended it.* (Italics ours). "If this rule is violated," says Chief Justice Best, "the fate of the accused person is decided by the arbitrary discretion of the judges, and not by the express authority of the laws." The principle that the legislative intent is to be found if possible in the enactment itself, and that the statutes are not to be extended by construction to cases not fairly and clearly embraced in their terms, is one of great importance to the citizen. The courts have no power to create offenses, but if, by a latitudinarian construction, they construe cases not provided for to be within the legislative enactments, it is manifest that the safety and liberty of the citizen are put in peril, and that the legislative domain has been invaded. Of course, an enactment is not to be frittered away by forced constructions, by metaphysical niceties, or mere verbal and sharp criticism; never the less the doctrine is funda-mental in English and American law, that there can be no constructive offenses; that before a man can be punished, his case must be plainly and unmistakably within the statute, *and if there be any fair doubt whether the statute embraces it, that doubt is to be resolved in favor of the accused.* These principles of law admit of no dispute, and have been often declared by the highest courts, and by no tribunal more clearly than the Supreme Court of the United States.' "

Applying to the statute under construction the plain rules recognized

in Murray et al. v. State (supra), we are constrained to hold that the information in the present case does not charge appellant with any offense defined by the statute.

The judgment is reversed and the prosecution is ordered dismissed.

*Reversed and prosecution ordered dismissed.*