**KANSAS CITY TERMINAL RAILWAY CO.,**
a Corporation, Plaintiff-Respondent,

v.

**KANSAS CITY TRANSIT, INC., a Corporation, Defendant-Appellant,**

Kansas City, Missouri, a Municipal Corporation, Defendant.

No. 49234.

Supreme Court of Missouri,

En Banc.

July 16, 1962.

Rehearing Denied Sept. 10, 1962.

Sam D. Parker, William M. Stapleton, Kansas City, for plaintiff-respondent. Lathrop, Righter, Gordon & Parker, Kansas City, of counsel.

HYDE, Judge.

Action for declaratory judgment and other relief including a money judgment for plaintiff, the Kansas City Terminal Railway Co. (hereinafter called "Terminal") against defendant Kansas City Transit, Inc. (hereinafter called "Transit"). The trial court's judgment gave Terminal the declaratory relief sought and a judgment against Transit for $5,613.30. Defendant City of Kansas City (hereinafter called "City") was given judgment on a counterclaim against Terminal for $5,884.22 from which Terminal did not appeal. Because the amount in dispute was insufficient to give this court jurisdiction, we transferred this case to the Kansas City Court of Appeals. After hearing there, the Court of Appeals reversed the judgment of the trial court without ordering any declaratory judgment on the issues involved. For proper procedure see Smith v. Pettis County, 345 Mo. 839, 136 S.W.2d 282; Kingston v. St. Louis Union Trust Co., 348 Mo. 448, 154 S.W.2d 39; Strype v. Lewis, 352 Mo. 1004, 180 S.W.2d 688, 155 A.L.R. 99; King v. Priest, 357 Mo. 68, 206 S.W.2d 547; Preisler v. Doherty, 365 Mo. 460, 284 S.W.2d 427, 440; Evans v. Brussel, Mo.Sup., 300 S.W.2d 442; Mayor, Councilmen and Citizens of City of Liberty v. Dealers Transport Co., Mo.Sup., 343 S.W.2d 40. The previous opinions in this case are Kansas City Terminal Railway Co. v. Kansas City Transit, Inc., Mo. Sup., 339 S.W.2d 766, Mo.App., 350 S.W. 2d 828. On application of Terminal, we transferred the case here. See Sec. 10, Art. V, Const., V.A.M.S. and Rule 84.05, V.A.M.R.

The issues for decision herein are whether, under ordinances of City and contracts

Powell C. Groner, Hale Houts, Hogsett, Houts, James, Randall & Hogsett, Kansas City, for defendant-appellant.

between Terminal and Transit relating thereto, Transit is required to pay a portion of the maintenance cost of certain viaducts and subways after abandoning the use of streetcars using tracks and substituting motorbuses and trolley buses therefor. Transit is the successor of previous companies which made the contracts, and are named in the ordinances but we will use the term "Transit" as designating all of them as it has assumed the obligations of its predecessors.

Terminal's petition was in two counts. Count 1 sought a declaration that Transit was obligated by certain ordinances of 1909 and 1911 (No. 2336 and No. 9701) to pay Terminal one-half of the cost of maintenance of certain viaducts, subways and approaches thereto for such time as Transit had operated or would operate buses thereon and sought a money judgment for one-half of the cost of maintenance expended thereon by Terminal. Count 2 sought a declaration that a 1917 contract between Terminal and Transit and ordinances in connection therewith required Transit to pay Terminal one-third of the maintenance cost of the viaducts, subways and approaches mentioned therein and sought a money judgment for one-third of the cost of maintenance expended thereon by Terminal. The parties have made a stipulation of facts and much of the evidence is documentary but there were also interrogatories and answers, a deposition and some oral evidence. (Terminal had oral testimony that the use of buses required more maintenance expense on viaducts than streetcars.) The trial court made findings of fact, stated its conclusions of law and entered a decree declaring that:

"1. The use of the viaducts and subways and approaches thereto in Kansas City, Missouri, which are subject to the provisions of Ordinances of Kansas City No. 2336 and 9701, by Kansas City Public Service Company for the transportation of passengers by bus or by means other than

streetcar is the same use contemplated by and within Ordinances of Kansas City No. 2336, 9701 and 54217.

"2. The 1917 contract between Kansas City Terminal Railway Company and Kansas City Railways Company, adopted by Kansas City Public Service Company, is in full force and effect, and Kansas City Public Service Company has been, is now, and will in the future be obligated to pay to Kansas City Terminal Railway Company, during such times as it has in the past used, is now using, or may in the future use said viaducts and subways for the transportation of passengers, one-third of the cost of maintenance or repair of the following viaducts and subways and the approaches thereto: The viaducts at Grand Avenue, Charlotte Street, Troost Avenue, Vine Street, Brooklyn Avenue, Prospect Avenue, 18th Street, and the Extension of Main Street south of 23rd Street (270 feet), and the subways at 15th Street, 9th Street, 12th Street, Jackson Avenue, Southwest Boulevard, and Summit Street.

"3. Kansas City Public Service Company is obligated to pay to Kansas City Terminal Railway Company one-half of the cost of maintenance and repair of all viaducts and subways and the approaches thereto which are subject to the provisions of Ordinances of Kansas City No. 2336 and 9701 and not included in the above described 1917 contract, during the time or times when said viaducts or subways were or are now being, or may in the future be used by Kansas City Public Service Company for the transportation of passengers by bus or any means other than streetcar." (Transit is the successor of Kansas City Public Service Co.)

The 1909 ordinance (No. 2336) gave Terminal its franchise and the 1911 ordinance (No. 9701) was supplemental to it. Terminal's franchise was for 200 years and it was required to build and maintain viaducts or subways for the City streets it crossed. Sec. 19(a) of Ordinance 2336

provided that before City shall permit any company to "operate a streetcar line or lines over or upon any of the viaducts" constructed by Terminal it shall require payment of one-half the cost to Terminal and "to enter into a suitable undertaking to pay \* \* \* Terminal \* \* \* one-half of the subsequent maintenance of \* \* \* viaducts during the period of such use." Sec. 19(b) contained similar provisions concerning subways. Ordinance 9701 made provisions for substitution of viaducts for certain designated subways and subways for certain designated viaducts made necessary by change of grade of streets. Transit's latest franchise ordinance of 1927 (No. 54217) granted it the right to "own, construct, reconstruct, improve, maintain and operate as a common carrier of passengers for hire \* \* \* the certain street railway lines now existing \* \* \* and also such additions thereto and extensions thereof as shall be hereafter made or required in accordance with the terms and provisions of this Ordinance." It further provided that "if the City is legally bound by any franchise contract with" Terminal to require any predecessor of Transit to pay to Terminal "any sum towards the construction or maintenance of viaducts or subways or approaches thereto upon any route to be used for streetcar traffic under this contract, the company shall be required to pay the same, otherwise not." It further stated: "The purpose is to leave in the Terminal Company every legal right it has, if any, under its franchise with the City, and to have the Company (Transit) pay for the use and maintenance of said viaducts, subways and approaches, if legally required by said Terminal Company's franchise."

Ordinance 54217 was amended in 1937 to provide: "To the end that modernization, improvement and expansion of the street railway system \* \* \* operated \* \* \* pursuant to Ordinance No. 54217 be continued in the public interest, said company

\* \* \* is hereby authorized \* \* \* to install from time to time and operate trolley bus and motor bus lines \* \* \* (a) as substituted lines for existing facilities, (b) as feeder lines \* \* \* and (c) as special service lines (such as trunk and express lines, etc.) additional to existing facilities." Authorization by the City and the Public Service Commission of Missouri was required. Thereafter, substitution of trolley buses and motorbuses was authorized by the Missouri Public Service Commission at various times without formal objection by City; and the present use of all of the viaducts and subways involved is by such buses only. Transit is now operating under the jurisdiction of the Public Service Commission without a new franchise from the City.

The 1917 contract between Terminal and Transit stated it was intended to settle all differences between them "with respect to all viaducts and subways mentioned \* \* \* and be in substitution of all rights, however, arising, that are or could be claimed by either party against the other." It further stated that "as to all other viaducts and subways \* \* \* the rights and remedies of the parties remain as they now exist." It stated in paragraphs 2 and 3 the amount Transit was to pay Terminal for the construction cost of certain designated subways and viaducts; and in paragraph 3 provided for paving to be done and maintained by Transit between and for 18 inches outside its tracks. Paragraph 4 was as follows: "The cost of future maintenance (except of paving, provision for which is above provided) of each viaduct and subway mentioned in paragraph 2 and 3 hereof, and the approaches thereto, shall be paid one-third by the Railways and two-thirds by the Terminal." Other paragraphs required City's approval of this contract by ordinance, including the right of Transit to construct and operate certain additional "street railway lines." This contract was approved by ordinance No. 30355. It was stated that ten viaducts and six subways are now used

by Transit and that of these seven viaducts and five subways are covered by the 1917 contract.

Transit says the facts being established by documentary evidence and stipulations of the parties, we are to reach our own conclusions on the facts and the law without deference to the trial court, citing Lukas v. Hays, Mo.Sup., 283 S.W.2d 561, 565, holding "the rule of deference does not apply to this type of evidence;" and we shall do so. Transit's contentions are that as a matter of law a bus is not a streetcar and the term "street car lines" used in Terminal's franchise ordinances cannot mean or include bus lines; and that to declare they have the same meaning is to rewrite the franchise and make and enforce a new contract instead of giving effect to the actual franchise contract. As to the 1917 contract, Transit says it must be construed in the light of surrounding circumstances, with reference to the original franchise ordinances and what was done under them, and also considering the provisions in this contract concerning its right to lay additional tracks and its obligation for paving along its tracks. So construed Transit says this contract "imposed no obligation upon Transit to contribute to Terminal for the maintenance of Terminal viaducts, subways or approaches used by Transit for the transportation by buses or any means other than streetcars."

Transit cites Patillo v. State, 120 Tex.Cr. R. 568, 47 S.W.2d 847; City of Philadelphia v. Philadelphia Transportation Co., 345 Pa. 244, 26 A.2d 909; Levy v. New Orleans & Northeastern R. Co., La.App., 20 So.2d 559; State v. York Utilities Co., 142 Me. 40, 45 A.2d 634; Akron Transportation Co. v. Glander, 155 Ohio, 471, 99 N.E.2d 493, 497; Utah Rapid Transit Co. v. Ogden City, 89 Utah, 546, 58 P.2d 1; Woodward v. City of Seattle, 140 Wash. 83, 248 P. 73. The Patillo case was a prosecution for violation of a statute imposing a fine: "If any passenger upon a train or street car or interurban car provided with separate coaches or compartments as above provided shall ride in any coach or compartment not designated for his race after having been forbidden to do so by the conductor in charge of the train." The court held this did not apply to a passenger on a bus, saying: "In common language a train, street car, or interurban car is understood to be one which serves the public in conveying passengers or freight, or both, and which runs upon fixed tracks. 'Bus' is a contraction of the word 'omnibus,' and it is well understood to be a vehicle which serves the passenger public, but which does not operate upon fixed tracks. It certainly is not a 'train,' nor an 'interurban car,' and no one would understand in common language that, when a street car was mentioned, it had reference to a 'bus.'" Since this was a statute creating a crime, the court followed the well-established rule of strict construction resolving any fair doubt as to what was intended to be a crime in favor of the accused.

In the City of Philadelphia case, the issue was the meaning and application of tax ordinances. The transportation company had taken over a company operating a street railway and its subsidiary company operating buses. The license fees paid by the bus company for motorbuses were $50.00 per vehicle but the street railway made fixed annual payments which were in lieu of "all license fees with respect to the cars run upon the said streets, or over the various city bridges or the system of operating said cars, and shall be in lieu of the right of the City hereafter to impose upon the Company, or its subsidiary companies, similar obligations or charges * * *"; and also in lieu of other obligations including paving and repairing streets. The company sought to add several hundred more buses without paying the $50.00 fee per vehicle, claiming the fixed amount required for the operation of the street railway covered all fees for all its operations. The Court held "that the clause 'all license fees with respect to cars run upon the said streets or over the various

City bridges or the system of operating such cars' refers solely to street passenger railway cars or trolley cars and not to motor buses which are not limited to any given area but may operate over the entire cartway of the street"; and that "the broad provision immediately following, namely, that the fixed annual payments 'shall be in lieu of the right of the City hereafter to impose upon the Company, or its subsidiary companies, similar obligations or charges,' must be restricted in its application to the general subject matter to which the preceding specific clauses have reference, in other words, the similar obligations and charges incident to the operation of a street passenger railway system." The court also relied on the interpretation of these provisions by the original companies which had been taken over and their previous practice of paying both the amount fixed for the street railway and the vehicle fees for buses.

The other cases also involved interpretations of terms used in statutes or ordinance. In York Utilities Company case (45 A.2d 634) a company that had substituted buses for cars on street railway tracks was held, with respect to its bus lines, not engaged in operating a street railroad, within the meaning of a statute making a street railroad subject to gross receipts taxes. In the Akron Transportation Company case (99 N.E.2d 493) a company using only trolley and motorbuses was held not to be a street railroad and therefore not taxable as a public utility; but the statutes separately defined a motor transportation company. In the Levy case (20 So.2d 559) an ordinance requiring a railroad to have a flagman at each crossing, where the railroad crossed streets on which streetcars were running, was held not to apply to crossings where buses had been substituted for streetcars. In the Utah Rapid Transit case (58 P.2d 1) a statute, authorizing a city to operate a street railway, was held not to give it authority to operate motorbuses. However, the City had never operated a street railway and so did "not claim the authority to operate motor vehicles as an incident to the operation of a street railway." Likewise in the City of Seattle case (248 P. 73) the court held that a statute authorizing a city to operate "railways" did not give power to operate buses. See also Utah Light & Traction Co. v. Public Service Comm., 101 Utah 99, 118 P.2d 683, 689.

A different view was taken in Russell v. Kentucky Utilities Co., 231 Ky., 820, 22 S.W.2d 289, 66 A.L.R. 1238, where a franchise was granted to Paducah Railway Company in 1919 "to operate street cars on and over the streets of the City of Paducah." In 1927, the City Council granted to Railway Company by ordinance the right to operate motorbuses over certain of these streets on which thereafter streetcars were to be discontinued. A taxpayer objected on the ground that the 1927 ordinance was a new franchise requiring the approval of the voters. The court held the ordinance valid without the necessity of the approval by popular vote. The court said, 22 S.W.2d 1 c. 291: "The purpose and object of the franchise involved in this case was to provide for the rapid and convenient transportation of the public. That was the basic right granted. The motive power or method of propulsion of the vehicle is subordinate or subsidiary. It is but the means of making the franchise effective. Is the substitution of cars running on rubber tires, free from limitations of steel rails and trolley wires, and propelled by internal combustion engines, in place of cars with metal wheels without tires on fixed rails, and propelled by electric motors supplied with power through overhead wires, such a radical departure from the purposes and objects and terms of the original franchise as to preclude the change? If busses be used for the transportation of passengers, there is no additional servitude on the streets or obstructions to the free and safe use of the streets by other vehicles. On the contrary, the streets are relieved of trolley poles and wires and the imbedded rails, more or less dangerous. It can hardly be said that the

operation of the busses is more dangerous or obstructive than the operation of electric street cars on the thoroughfares. The problem is one of distinction between the essence in which the permanent values lie—the use of streets for transportation of passengers for hire—and the incidents of that franchisal right which are subject to change by agreement, viz. the facilities to be used."

Likewise in Scott v. Cincinnati, N. & C. Ry. Co., 268 Ky. 383, 105 S.W.2d 169, a city had granted a franchise "to operate upon the streets of the city a street railway system, equipped with electrically propelled street cars for the transportation of passengers." The court in holding substitution of buses proper under this franchise said: "Such a change in motive power and transportation vehicles is permitted in order to meet changed and altered conditions, since, in doing so, the service contracted for in granting the franchise is not interfered with by the change, but is continued to be carried out and performed, in a manner to meet new conditions, and at the same time to not be in the least detrimental to the safety and convenience of the traveling public." In a similar case, Warren v. Fitzgerald, 189 Md. 476, 56 A.2d 827, 831, the court said: "Transportation is the end, rails and motive power are means. When new motive power makes rails unnecessary, power to furnish transportation is not lost." See also Denny v. Brady, 201 Ind. 59, 163 N.E. 489; Kansas Electric Power Co. v. Walker, 142 Kan. 808, 51 P.2d 1002, 102 A.L.R. 387; Carolina Power & Light Co. v. Iseley, 203 N.C. 811, 167 S.E. 56; City of Columbia v. Tatum, 174 S.C. 366, 177 S.E. 541; City of Columbia v. Pearman, 180 S.C. 296, 185 S.E. 747; Anderson v. Knoxville Power & Light Co., 16 Tenn.App. 259, 64 S.W.2d 204; 83 C.J.S. Street Railroads § 142, Motorbusses, p. 262; Annotation 75 A.L.R. 246.

■ It is our view that construction of these ordinances and contracts cannot be made solely on the narrow issue of a technical meaning of the words "streetcar line or lines" and references to tracks. We must determine the maintenance obligation from all the ordinances, the 1917 contract and all surrounding circumstances. The original 1909 franchise ordinance used broad disjunctive language, namely: that before permitting anyone "to construct, maintain or operate a streetcar line or lines" over the viaducts the city should require "the first person or company desiring to so use and who shall be permitted to use such viaduct or viaducts or the approaches thereto, or to construct a track or tracks thereon, to pay" to Terminal "one-half the cost, including land damages" and agree to pay one-half of the subsequent maintenance. Thus Transit was required to assume the same status as Terminal as to paying the cost of building the viaducts and subways and their approaches, including the land cost. Therefore, it was contemplated that Transit and Terminal should participate in this enterprise on the same cost basis. However, Transit was given a way out of its obligation for maintenance because that obligation was for "the period of such use." No doubt one reason for this was that Transit would have a shorter franchise term than Terminal. The decisive issue is: what "use" was meant? Transit is still using the viaducts and subways (as stated in its answer to interrogatories) for "transportation of metropolitan passengers as a common carrier in intrastate and interstate commerce." It is our view that this was the use originally contemplated although the motive power and type of vehicle has changed; and reasonably it must have been expected that there would be changes. Our statutes of 1899 authorizing organization of street railroad companies provided for their incorporation "for public use in the conveyance of persons" (Sec. 1186, R.S. 1899, Section 391.010 RSMo 1959, V.A.M.S.); and further provided such a company should have power "to operate its road by animal, cable, electric or other motive power."

(Sec. 1187, R.S.1899, Section 391.020 RS Mo 1959, V.A.M.S.) Furthermore, in the stipulation of facts herein, it is stated: "Regular common carrier transportation of metropolitan passengers by motor buses began in London, England, in 1904 and has been in operation there ever since that time. Experimental motor bus operation for public transportation began on Fifth Avenue in New York City, New York, in 1905, and regular common carrier transportation of metropolitan passengers by motor buses began on a permanent basis in 1907 on Fifth Avenue in New York City and has been in operation there ever since that time." Thus common carrier bus transportation was not unknown in 1909, but nothing was said in the original ordinances either for or against its use and it was not being used in Kansas City at that time.

As long ago as 1868, the Supreme Court of Pennsylvania in Frankford and Philadelphia Pass. Ry. Co. v. City of Philadelphia, 58 Pa. 119, 125, 98 Am.Dec. 242, ruled that the City of Philadelphia had authority to require payment of a license fee on cars operated on rails within the city under a legislative act of 1850 giving the city authority by ordinance "to provide for the proper regulation of omnibuses, or vehicles in the nature thereof" and "to provide for the issuing of licenses * * * to keep and use omnibuses or vehicles in the nature thereof and to charge a reasonable annual or other sum therefor." The court said: "This act is still in force. It plainly authorizes regulation by the issue of licenses. And we are of opinion that it applies to passenger railway cars. They are omnibuses, or if not, they are vehicles in the nature of omnibuses. They are opened to all, intended for all. The change of form from that of anything known when the Act of Assembly was passed, is not a change of the nature of the vehicle. In one city, at least, of Europe, large vehicles intended for indiscriminate public use, run sometimes upon a railway track, and at other times upon a common pavement. Nobody can doubt they are omnibuses. The form of the wheels, or the character of the roadway over which a vehicle runs, does not determine its nature so much as do the uses to which it is put, and for which it was designed."

In Higgins v. St. Louis & Suburban Ry. Co., 197 Mo. 300, 313, 95 S.W. 863, this court construed Sec. 2864, R.S.1899 (of our wrongful death act) to apply to streetcars before streetcars and street railroads were mentioned in the act by amendment in 1905 (Laws 1905, p. 135), saying: "There is no question that a street car is a public conveyance. If we attach horses thereto and put on a driver, under another clause of the statute, we would have liability of the company, but according to contention of counsel for defendant, no liability, if we changed the propelling power to electricity. In other words we would have street railway companies liable at times and not liable at other times, if they changed their motive power. In our judgment the statute was intended to apply to public conveyances of whatever kind, as first hereinabove stated."

■ Coming to the 1917 contract, we find that, in stating the obligation of Transit to pay one-third of the cost of the specified viaducts and subways and one-third of the cost of future maintenance of the designated viaducts and subways, there was no mention whatever of tracks on them or the operation of streetcars over or through them. The obligation to pay was unequivocal and unconditional. Although elsewhere therein the right to put tracks on the station plaza was stated and the obligation to pave around tracks on viaducts and in subways provided, the obligation for the cost of future maintenance as well as the cost of building the new structures was stated unconditionally without regard to how they were to be used by Transit. As noted 12 of the 16 structures now used by Transit are covered by the 1917 agreement. To be considered also is the 1937 ordinance amending Transit's franchise for the purpose of permitting

"modernization, improvement and expansion of the street railway system" by authorizing "motor bus lines * * * as substituted lines for existing facilities." Similar statements were made in subsequent applications to the Public Service Commission for authority to substitute trolley bus lines and motorbus lines for streetcar lines. Thus it was understood and authorized that the buses were to be used for the same purpose as the streetcars; and by abandoning tracks, Transit was relieved of its obligation to pave around tracks.

Considering all these ordinances together with the 1917 contract as a whole, we must agree with the trial court's conclusions, hereinabove set out. (For rules of construction see Williston on Contracts, 3rd Ed., Secs. 618, 619; 12 Am.Jr. 745, Contracts, Secs. 226 et seq.; 17 C.J.S. Contracts § 294 et seq., p. 682.) It is our view that the main purpose of agreement required by the original ordinance and the 1917 contract was to require Transit to participate with Terminal in building the viaducts and subways, required for its transportation of passengers as a common carrier over or under the tracks Terminal was building through the city (paying half the cost of the original ones and one-third of the later ones), and to pay the same proportion of their maintenance cost during the period of their use by Transit in its business of transporting passengers as a common carrier. There was nothing in the original ordinances limiting or requiring Transit to use any particular type of vehicle or motive power; and the subsequent ordinances recognized that motorbus lines were substituted lines for existing facilities permitted for the purpose of modernization of Transit's street railway system. Although Transit points out that many other motor vehicles (including some buses owned by other companies) use the viaducts and subways, it was always intended that they should be open to public use as public ways of travel and it can make no differ-

ence that such use is now by motor vehicles rather than mainly by horse drawn vehicles, as originally, or that the volume of traffic from such public use has increased. It must have been contemplated that traffic would increase as the city grew and at the time of the 1917 contract much of it was by motor vehicles. Our view as to the reasonable construction of the agreement (based on the ordinances and contract) considered as a whole is that the maintenance obligation continues as long as Transit continues to use the viaducts and subways for its business of surface transportation of passengers over them regardless of the kind of motive power and vehicles used for that purpose.

The judgment is affirmed.

All concur.