UNION PACIFIC RAILROAD COMPANY, Plaintiff-Respondent,

v.

KANSAS CITY TRANSIT COMPANY, Inc., Defendant-Appellant.

No. 24299.

Kansas City Court of Appeals. Missouri.

Feb. 7, 1966.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 4, 1966.

Application to Transfer Denied May 9, 1966.

Harold T. VanDyke, Kansas City, for appellant; Albert Thomson, Linde, Thomson, VanDyke, Fairchild & Langworthy, Kansas City, of counsel.

George T. Morton, Jr., and Allan L. Bioff, Kansas City, for respondent; Watson, Ess, Marshall & Enggas, Kansas City, of counsel.

CROSS, Presiding Judge.

This is an action to enforce a contract obligation. A jury waived trial of the case resulted in a judgment that plaintiff Union Pacific Railroad Company recover of defendant Kansas City Transit Company, Inc. the sum of $8,378.39, with interest, a total of $10,263.52, as and for defendant's agreed contributive share of the cost of repairing a viaduct approach. Defendant appeals.

Plaintiff, hereinafter generally referred to as "Union Pacific" is a railroad corporation engaged in interstate commerce as a common carrier of passengers, goods and merchandise. Defendant, hereinafter generally designated as "Transit", is a Missouri corporation engaged in the business of transporting metropolitan passengers as a common carrier in Kansas City, Missouri. Prior to June 17, 1960, defendant was known as "Kansas City Public Service Company", but on or about that date amended its articles of incorporation so as to change its name to "Kansas City Transit, Inc.".

In 1884 the cities of Kansas City, Missouri, and Kansas City, Kansas, constructed a viaduct for general public travel over the tracks of the Union Pacific (and another railroad company) extending from 12th Street in Kansas City, Missouri, northwestwardly along James Street, into the State of Kansas, together wtih approaches to the viaduct.

In 1904 and 1905 the Metropolitan Street Railway Company, a predecessor of Transit, constructed a separate viaduct for its street railway tracks, located parallel with and on the westerly side of the James Street viaduct above referred to, and constructed an approach carrying its street car tracks, extending from 12th and Genessee to connect with its separate street railway viaduct near State Line.

In 1917 the city of Kansas City, Missouri, enacted Ordinance No. 30871 condemning the James Street viaduct and its 12th Street approach as "old, worn out and no longer safe for public travel", and requiring Union Pacific to replace that portion of the James Street viaduct located

in the State of Missouri with an entirely new viaduct structure and the Twelfth Street approach to that viaduct, all in accordance with prescribed dimensions, capacities and specifications, including the requirement that "The approach shall be of such strength and character as to permit the use thereof with a double track electric street railway by the Kansas City Railways Company, (successor of Metropolitan Street Railway Company and immediate predecessor of Kansas City Public Service Company), its successors and assigns". The ordinance provided that the city pay a portion of the cost of construction ($8,114.70) and that the balance be paid by Union Pacific and Kansas City Railways in such proportion as "they may agree upon". The ordinance reserved the viaduct and approach as property of the city "as and for a public highway" and made the city responsible for maintaining and repairing the structures, but provided that the cost of so doing shall be contributed and paid by Union Pacific and Kansas City Railways Company, or their successors, in "the proportion that each contributes toward the original cost thereof". (Similarly, the City of Kansas City, Kansas, required the Union Pacific (and another railroad) to replace the remaining portion of the James Street viaduct, located in the State of Kansas, with an entirely new structure).

On October 14, 1917, pursuant to the mandate of Ordinance No. 30871, Union Pacific and Kansas City Railways Company entered into a written contract agreeing that Union Pacific "acting as agent for the joint account of both parties" would proceed to construct, at the joint expense of both parties, a new Twelfth Street approach to the James Street viaduct. The subject matter of the contract, insofar as it defined rights and duties of the parties, was limited to the approach and did not include the viaduct proper. The contract obligated Union Pacific to install a double lane of street car tracks on the approach running from Twelfth Street to a point near the Railways Company's separate viaduct, and required the Railways Company to pay the sum of $13,000.00 as its proportion of the construction cost and expenses. With respect to the cost of maintenance and repairs, the parties agreed as follows:

"Sec. 8. That the entire amount of the cost and expense which the parties hereto are required to bear for the maintenance and repair of said 12th Street approach, except the cost of maintenance and repair of paving thereon, shall be apportioned between the parties hereto as follows:
Pacific Company ...... 66⅔%;
Railways Company .... 33⅓%;

Total ..... 100% ...."

Section 8 further provided that Railways would bear the entire cost of maintenance, repair and renewal of its tracks and the approach paving between the track rails and for a distance of 18 inches outside thereof. Pacific was obligated to bear exclusively the cost of maintaining and repairing all other parts of the paving.

During the years 1919 and 1920 Union Pacific reconstructed and replaced the James Street viaduct and the Twelfth Street approach pursuant to and in conformity with the requirements of the City's Ordinance above referred to. And, in accordance with its agreement with the Kansas City Railways Company (1917 contract), as part of the reconstruction and replacement of the Twelfth Street approach, provided street railway tracks on that structure. In all respects Union Pacific has fully complied with the terms and conditions of the 1917 contract.

The obligations of the 1917 contract, on which the present action is founded, were expressly assumed by defendant as the result of a contract entered into on July 28, 1927, by and between Union Pacific and defendant, (then known as Kansas City Public Service Company).

Transit and its predecessors operated street cars over and along its tracks on the new Twelfth Street approach and on the separate street car viaduct with which it connected until July 6, 1956, but on or about that date abandoned and discontinued the use of that particular street railway line, and commenced operating motor buses over the Twelfth Street approach and the James Street Viaduct. Since that time Transit has operated over the Twelfth Street approach and viaduct entirely by motor powered buses. Some time in 1956 Transit dismantled its separate street car viaduct, and, on August 5, 1957, conveyed to the city its track and right of way located on the Twelfth Street approach. Transit is not presently operating under franchise with the city but is operating solely under authority of the Missouri Public Service Commission.

On March 11, 1960, the city filed an application with the Missouri Public Service Commission requesting authority to make certain repairs to James Street viaduct, including the Twelfth Street approach, and for an apportionment of cost. Both Union Pacific and Transit were made parties to that proceeding. The Commission duly entered an order effective July 20, 1960, authorizing the city to repair the viaduct and approach as requested and ordered Union Pacific to pay 50% of the total cost of repair and the city to pay the remaining 50% of such cost. Included in the Commission's finding is the following: "None of the cost and expenses occasioned by or involved in this proceeding is apportioned to or imposed upon Kansas City Public Service Company; and nothing herein contained is intended or shall be deemed to adjudicate or affect such contractual rights, if any, as Union Pacific Railroad Company may have to require said Public Service Company to bear a portion of the costs and expenses hereby imposed upon it".

In the latter part of 1960 the city made extensive repairs to the James Street viaduct and the Twelfth Street approach as the Commission had authorized. The substruc-tures of both the bridge and approach were rebuilt by the process of chipping out the "old and spoiled concrete" and shooting concrete back under pressure. Some of the iron hand railing, which was old and rusty, was replaced. There were no paving repairs except installation of one new expansion joint on the approach. The city's engineer testified that the work done was "maintenance" and was due to fatigue, weather elements and age.

The total cost of the repairs to the approach structure was $50,270.33. Upon completion of the work the Union Pacific paid the city $25,135.16 as one-half the total cost, in compliance with the Commission's order. Union Pacific then made demand on Transit, based on the 1917 and 1927 contracts referred to, for reimbursement of one-third of the amount it had been required to pay for repairs to the approach structure, in the sum of $8,378.39. Transit refused to pay and Union Pacific commenced this action. The terms of the resulting judgment are set out in the first paragraph of this opinion.

The foregoing statement of the facts and circumstances of the case conforms generally with the findings of fact made by the trial court. There is no factual dispute between the parties who are in agreement that the question presented by this appeal is "strictly a construction of this contract".

Transit's brief presents three theories of defense. In Point I Transit insists that Union Pacific has not been damaged by its failure to pay ⅓ of the repair costs that were allocated to and paid by Union Pacific because "Payment by the city discharged the obligation of Transit to pay". In support of this contention Transit argues as follows: "Under the 1917 contract, the cost of the maintenance of the approach to the James Street viaduct was to be borne ⅔ by the Union Pacific and ⅓ by Transit. * * * The total cost of the 1960 repairs to the approach here in suit was * * * the amount of $50,270.33. Under its 1917 contract, the Union Pacific was obligated to

pay ⅔rds of that amount, or $33,513.54. The Union Pacific has only paid $25,135.16 * * * as its portion of the repair. The city paid the other half. It is easy to see that the Union Pacific has not even paid the ⅔rds that it was required to pay and yet it seeks recovery. * * * The Union Pacific can only recover if it is required to pay more than ⅔rds of the cost of the repair. It has paid $8,000 less than ⅔rds of the cost of repair and therefore has no cause of action against Transit. If the Union Pacific had paid more than it was obligated to pay (⅔rds) for maintenance of the approach, then it might have a cause of action against Transit. Here, it has paid less. Therefore, it has no cause of action against Transit".

■ The foregoing theory is fallacious because it is founded on a misconception of the 1917 contract. *That undertaking did not obligate Union Pacific to pay two-thirds of the total cost of repairs.* In exact and unmistakable language it provided for apportionment, two-thirds to Union Pacific and one-third to Transit's predecessor "* * * of the cost and expense *which the parties hereto are required to bear* for the maintenance and repairs of said 12th Street approach". (Italics added.) Thus the parties clearly expressed their mutual intention and obligation to share the cost of such future repairs as might be imposed upon either one, or both of them, in the agreed percentage portion, and to contribute, one to the other, accordingly.

When the 1917 contract was entered into, circumstances existed under which the parties could reasonably expect that some portion of future repair costs might be assumed by the city or allocated to it by the Missouri Public Service Commission. The 12th Street approach had been specifically reserved by the city ordinance as "the property of Kansas City, Missouri, as and for a public highway". The city was empowered by the 1917 ordinance, if repairs became necessary, to proceed at once to make such repairs and to collect from Union Pacific and Transit their "respective" shares of the cost resulting. Most significant is the circumstance that the contract was made in contemplation of the Public Service Commission Law, which was enacted in 1913 and has continuously provided to the present time that the Commission may allocate a portion of the costs incident to maintenance of grade separation crossings, such as this case involves, to the "municipality or other public authority in interest". V.A.M.S., Section 389.640; State ex rel. and to Use of Kansas City Southern Ry. Co. v. Public Service Commission, 325 Mo. 862, 30 S.W.2d 112. We must assume that the parties contracted with such contingency in mind, and that their agreement to apportion and share repair costs "which they were required to bear" referred to net amounts over and above any sum that might be allocated to and borne by the city as its share.

■ It is our view that the city's payment of one-half the repair costs pursuant to order of the Public Service Commission had no effect on the operation of the contract, except to reduce the liability of both Union Pacific and Transit to one-half the sum each would have been obligated to pay if the city had not been required to contribute. Although the Commission's order authorized the city to proceed with the repairs and allocated 50% of the cost to the city and 50% thereof to Union Pacific, it is apparent from the terms of the order that the Commission did not intend to diminish or destroy the obligation of Transit to reimburse Union Pacific for one-third of the sum it had been "required to bear" as repair costs and expense. This is clearly shown by the Commission's recital that "* * * (N)othing herein contained is intended or shall be deemed to adjudicate or affect such contractual rights, if any, as Union Pacific Railroad Company may have to require said Public Service Company to bear a portion of the costs and expenses hereby imposed upon it". For that matter, the Commission was totally without jurisdiction

in the premises. "Since the commission is not a court, it 'has neither the power to construe contracts, nor to enforce them'". Katz Drug Company v. Kansas City Power and Light Company, Mo.App., 303 S.W.2d 672.

Transit's second point is a contention that the entry of judgment against it was error "because the contract upon which this suit is based is one terminable by either party". Transit argues that the 1917 contract does not stipulate the length of time it shall be effective and binding on the parties, and is therefore terminable by either party. This submission is made in reliance upon general rules to the effect that (1) where no time limit is inserted in a contract for the performance of services or the furnishing of commodities, or in a contract in the nature of a joint adventure or indemnity, such contracts are terminable at the will of either party,[1] and (2) that courts will construe a contract to impose an obligation or right in perpetuity only when the language of the agreement compels that construction.[2]

■ The foregoing general rules are not applicable in this case for several valid reasons. In the first place, we do not regard the contract as imposing the maintenance obligation in perpetuity. To the contrary, we believe that the parties intended to place a definite limitation of time upon their agreement. We adopt this view under the rule that "the intention of the parties with respect to duration and termination of their contract is to be determined from the surrounding circumstances and by application of a reasonable construction of the agreement as a whole; and the duration of a contract may be implied from the nature of the contract or from the circumstances surrounding it". 17A C.J.S. Contracts § 385(1), p. 457. In this connection, it is also the law that contracting parties are presumed to contract in refer-

ence to the existing law. It is commonly said that all existing applicable, relevant and valid statutes, *ordinances,* regulations and settled law of the land at the time a contract is made become a part of it and must be read into it. 17 Am.Jur.2d, Sec. 257, pp. 654–5. Also see cases digested in 7A Mo.Digest, Contracts, ■ Under this rule the 1917 ordinance is of special significance. Since the parties entered into their contract under its compulsion, we believe that their contract necessarily reflects its objects and purposes.

■ In basic substance, the ordinance is a direction upon Union Pacific and Transit's predecessor to effect construction of the Twelfth Street approach and James Street viaduct, "as and for a public highway", and to contribute to the cost of maintaining and repairing those structures "as and for a public highway". Therefore we believe that in determining the sense and purpose of the resulting maintenance agreement it should be read as if the words "as and for a public highway" had been incorporated therein by the parties. So understood, their mutual obligation to contribute to the cost of maintaining the approach would endure only so long as that structure stood "as and for a public highway". Thus the contract limited its own duration.

■ Furthermore, it is a recognized principle of law that "where a contract has been fully performed by one party it cannot be terminated by the other". 17A C.J. S. Contracts § 397, p. 477. For this reason alone, it must be held that the contract in suit is not terminable at Transit's option. Union Pacific has fully performed its agreed undertakings, which include the dismantling of a predecessor Twelfth Street approach, the construction of the subject approach, the expenditure of a substantial sum of money as its proportionate share of the cost of

---

1. See 17A C.J.S. Contracts § 398, pp. 478–480.

2. Paisley v. Lucas, 346 Mo. 827, 143 S.W. 2d 262; Superior Concrete Accessories v. Kemper, Mo.Sup., 284 S.W.2d 482.

constructing the approach, and the construction of a double line of street car tracks on the approach for the use and benefit of Transit. Under these circumstances Transit has no right to terminate the contract and avoid its obligation thereunder.

■ Finally,—even if the contract were of such a nature that made it terminable at the option of either party, *Transit has taken no steps whatsoever to exercise such hypothetical option* so far as the evidence and pleadings disclose. Therefore, it follows as a natural conclusion that the contract would still be effective and in force even though assumptively terminable. "A party may have the option to terminate the contract, either by virtue of express provision thereof * * * or by virtue of the fact that the contract fixes no period of duration and is terminable at will, * * *. However, notwithstanding a contract is voidable at the option of a party, some action on his part is necessary to rescind the contract, that is, he must manifest his election to terminate the contract, and before this is done the contract is not void. Mere intent to terminate a contract means nothing, since such intent, until carried into effect, may be changed, revoked or abandoned". 17A C.J.S. Contracts § 396, pp. 476–477.

It is submitted in the third point of Transit's brief that the judgment is erroneous "because, upon cessation of the use of the Twelfth Street Approach to the James Street Viaduct for carrying the tracks of the Transit Company, the reason for the obligation of the Transit Company to maintain the approach ceased".

■ One of Transit's arguments urged in support of the quoted proposition is that when the use of street cars was abandoned, Transit's subsequent operations over the approach by motor bus placed it in the same category as all other members of the public so using the streets of the city as public highways. This would be a valid contention if Transit were not bound by its

contract. Absent Transit's maintenance obligation created by that agreement the cost of repairs would be subject to apportionment by the Public Service Commission in accordance with V.A.M.S., Sec. 389.640, in the application of which the Commission has taken the position that it will not apportion any costs of grade crossing repairs to a carrier whose only use of the structure was incident to the transportation of passengers by motor bus. See, In re Wabash Railroad Co., 2 Mo. P.S.C. (N.S.) 243.

However, the question as to what Transit's position would be in the absence of the contract sued on is irrelevant to the present issue unless it can be demonstrated that the instrument is no longer valid. This Transit attempts to do by contending there is no longer any legal consideration to support the contract. Transit argues that "the sole purpose of the agreement was to allow its predecessor to place their *street railways tracks* on the approach, and to provide for the maintenance of the approach during the time it was used * * * in this manner". Hence, Transit says, after the street car tracks were removed there was no longer any need to provide for the location of tracks on the approach, and that therefore "The only reason for the contract no longer existed", and, that "defendant's performance under the contract should be excused because there has been a failure of consideration".

Again, Transit presents a false premise because, as we have stated above, the prime purpose of the 1917 contract was to provide for reconstruction and maintenance of a new approach and viaduct "as and for a public highway" to replace the former structures which had become "old, worn out and no longer safe for public travel", all in compliance with the city's order. It is true that references to street car tracks and their use were necessarily made in both the ordinance and the contract. We regard such references as incidental only, and ancillary to the substantive purpose of both documents. Consequently we reject Transit's suggestion that the "sole purpose" of

the contract was to accommodate street car tracks.

There has been no failure or lapse of consideration to excuse Transit from performing its contract obligations. Union Pacific furnished the consideration entitling it to performance by Transit when it *built* the approach promptly after execution of the 1917 contract and laid double lines of track to suit the structure for street car use, exactly as desired by Transit's predecessor. For more than 35 years thereafter Transit and its predecessors enjoyed continuous use of those facilities which, it is reasonable to assume, contributed materially to their deterioration and resulting need of repair. Furthermore, it is not disputed that Union Pacific has paid its agreed proportionate share of the cost of the structures involved—which, under the evidence appears to be two-thirds of the entire cost—or that it has performed its contract obligations fully, in all respects. It is the law that when a contracting party has fully performed its contract obligations it thereby acquires a *vested right* to performance by the other party in accordance with the contract terms. It was so held by the Supreme Court in the case of Kansas City v. Kansas City Terminal Ry. Co., 324 Mo. 882, 25 S.W.2d 1055. The facts there were that in 1909 the city had granted Terminal a franchise to operate railway lines through the city, requiring vacation of certain streets and thoroughfares, in return for which Terminal promised and agreed to construct viaducts at street crossings over its tracks, at its sole cost, whenever the city determined the reasonable necessity therefor. Subsequently the Missouri Public Service Commission Law was adopted, under which the Commission was authorized to apportion the cost of grade separation structures. Laws, 1913, Public Service Commission Act, Article III, Section 50, page 589 (present V.A.M.S., Section 389.640). Thereafter the city undertook to require Terminal to construct and pay for a viaduct at Oak Street pursuant to the franchise contract. Upon Terminal's refusal to comply, the city filed suit for specific performance. Holding that the city was entitled to the relief sought, the Supreme Court said, "The city having fully performed the contract on its part had, and has, a vested right to performance on the part of the company. Such vested right was not destroyed by the subsequent enactment of a police regulation of the character of the one involved". So it is in this case. The change of condition resulting from Transit's abandonment of street cars and its use of motor buses instead did not affect Union Pacific's vested right to performance by Transit. It is of no consequence that Transit thereafter derived no utility from the abandoned tracks. "If the promisor gets what he bargains for there is no failure of consideration, although what he receives becomes less valuable or of no value at all". 17 C.J.S. Contracts § 129, p. 848. Also see Vorchetto v. Sappenfield, 223 Mo.App. 460, 14 S.W.2d 685.

Transit's argument on this point is in reality a contention that the contract should be construed as containing an *implied limitation* to the effect that its obligation to share future costs of repairing the approach would cease *when its use by street cars might be abandoned*. Transit says that the intention of the parties to so limit the agreement is shown by (1) the circumstance that street cars were in fact used when the contract was made, and (2) the incidental references to street cars and tracks (previously mentioned in our fact statement), that had been recited in the contract. It is our opinion that the foregoing postulates do not establish by reasonable implication the "use" limitation pleaded for.

Those same submissions were also rejected as defenses by the Supreme Court in Kansas City Terminal Ry. Co. v. Kansas City Transit, Inc., 359 S.W.2d 698 (decided in 1962)—a suit by Terminal for (1) a declaration that Transit was obligated by certain ordinances to share the cost of maintaining viaduct and other street crossing structures over which it operates buses, and for a money judgment accordingly, and (2)

a declaration that a 1917 contract between Terminal and Transit's predecessor, Kansas City Railways Company, required Transit to pay Terminal one-third of the maintenance cost of the viaducts, subways and approaches mentioned therein, and likewise for a money judgment.

In deciding the Terminal case the Supreme Court made two determinations that bear vitally on the issues before us. The first question confronting the court was how to construe an ordinance which the City of Kansas City had enacted in 1909 granting Terminal a franchise to operate railway lines within the city and requiring Terminal to build viaducts and subways for the city streets it crossed. The ordinance contained a provision that before the city shall permit any company to "operate a streetcar line or lines over or upon any of the viaducts" constructed by Terminal it shall require payment of one-half the cost to Terminal by such company and also require it "to enter into a suitable undertaking to pay * * * one-half of the subsequent maintenance of * * * viaducts during the period of such use".

Transit urged the court to hold that the ordinance should not be construed so as to impose a continuing obligation upon it to pay any viaduct repair costs after it ceased to use street cars and began to operate buses. It was argued by Transit that as a matter of law a bus is not a street car and the term "street car lines" used in Terminal's franchise ordinances cannot mean or include bus lines; and, that to declare they have the same meaning is to rewrite the franchise and make and enforce a new contract instead of giving effect to the actual franchise contract. Rejecting these arguments the court held that "such use" did not refer solely to street cars—the agency of transportation in use when the ordinance was enacted—but that it meant use in the transportation of passengers as a common carrier, whether by street cars or by motor buses, and that consequently Transit was obligated to pay its share of maintenance

costs as provided by the terms of the franchise contract.

The court next undertook to determine the meaning and effect of the 1917 contract between Terminal and Railways (Transit's predecessor). The relevant contractual provision thereof is summarized in the opinion, as follows: "The cost of future maintenance (except of paving, provision for which is above provided) of each viaduct and subway mentioned in paragraph 2 and 3 hereof, and the approaches thereto, shall be paid one-third by the Railways and two-thirds by the Terminal". Likewise, the court summarized Transit's contentions as follows: "As to the 1917 contract, Transit says it must be construed in the light of surrounding circumstances, with reference to the original franchise ordinances and what was done under them, and also considering the provisions in this contract concerning its right to lay additional tracks and its obligation for paving along its tracks. So construed Transit says this contract 'imposed no obligation upon Transit to contribute to Terminal for the maintenance of Terminal viaducts, subways or approaches used by Transit for the transportation by buses or any means other than streetcars' ".

Again the Supreme Court rejected Transit's contentions and concluded that the maintenance obligation imposed by the above quoted contractual provision was unconditional and entirely unrelated to the manner of its use. The court said: "Coming to the 1917 contract, we find that, in stating the obligation of Transit to pay one-third of the cost of the specified viaducts and subways and one-third of the cost of future maintenance of the designated viaducts and subways, there was no mention whatever of tracks on them or the operation of streetcars over or through them. The obligation to pay was unequivocal and unconditional. Although elsewhere therein the right to put tracks on the station plaza was stated and the obligation to pave around tracks on viaducts and in subways provided, the obliga-

tion for the cost of future maintenance as well as the cost of building the new structures was stated unconditionally without regard to how they were to be used by Transit". The court reached the final conclusion that "Our view as to the reasonable construction of the agreement (based on the ordinances and contract) considered as a whole is that the maintenance obligation continues as long as Transit continues to use the viaducts and subways for its business of surface transportation of passengers over them regardless of the kind of motive power and vehicles used for that purpose".

Likewise in this case, Transit's agreement to pay a proportionate share of repair costs was expressed "unequivocally" and was stated "unconditionally and without regard to how * * * (the structures) * * * were to be used by Transit". We therefore rule, under the controlling effect of the Supreme Court's decision in the Terminal case, and for all the reasons we have heretofore stated, that Transit's obligation shall be enforced as written and without regard to whether its use of the approach is by street cars or by motor buses. Accordingly, we hold that Transit is liable on Union Pacific's present demand and that it will remain under obligation to pay its agreed proportionate one-third share of "the entire amount of the cost and expense which the parties hereto are required to bear for the maintenance and repair of said Twelfth Street approach (except for paving)"—so long as that particular structure stands "as and for a public highway". In our consideration of the issues we have carefully examined all cases and text authority relied upon by Transit, but we find nothing of substance therein to warrant different conclusions than those we have expressed.

The judgment is affirmed.

HOWARD, J., and FRANK W. HAYES, Special Judge, concur.

BLAIR, J., not participating.